## WILL HEMPHILL v. THE STATE.

### No. 2707.   Decided November 12, 1913.

### Rehearing denied February 4, 1914.

**1.—Rape—Charge of Court—Identity of Defendant—Weight of Evidence.**

Where, upon trial of rape, the evidence showed that the prosecutrix failed to recognize the defendant the previous night, but that she recognized him as the man who assaulted her on the following morning and so testified, and the court instructed the jury that they could not consider this as any evidence of guilt, but they could give it what credit they thought it was worth in passing on the credibility of the prosecutrix upon that particular point, the same was a charge on the weight of the evidence and reversible error. Prendergast, Presiding Judge, and Harper, Judge, dissenting.

**2.—Same—Argument of Counsel—Mob Violence—Bystanders' Bill.**

Where State's counsel threatened the jury with the statement that unless they assessed the death penalty the people would take the law in their own hands, and that such rape fiends would be dealt with at the hands of a mob, and that it would be worse than convicting an innocent man for them to acquit the defendant, etc., over the objections of the defendant duly preserved by a bystander' bill, the same was reversible error.

**3.—Same—Warning to Counsel for the State.**

If the accused in a capital case is to forfeit his life, it should be done under the most solemn forms of the law, and according to due process of law guaranteed by the Constitution and laws of our country. Following Smith v. State, 44 Texas Crim. Rep., 137, and other cases.

**4.—Same—Ex Parte Affidavits—Bystanders' Bill—Motion for Rehearing.**

Ex parte affidavits attacking a bystanders' bill of exceptions in the record on appeal can not be considered dehors the record, and are not permissible. Following Pye v. State, recently decided.

**5.—Same—Bill of Exceptions—Bystanders' Bill.**

Where the trial judge refused to approve a bill of exceptions presented to him objecting to the argument of State's counsel, stating that he, the judge, did not know what the remarks of the State's counsel were, and the matter was not called to his attention, whereupon appellant proved up his bill of exceptions by bystanders in accordance with the statute, the same must be considered on appeal, and a contest thereof by affidavit attached to the motion for rehearing by the State can not be considered. Following Johnson v. State, 42 Texas Crim. Rep., 298, and other cases.

Appeal from the District Court of Guadalupe.   Tried below before the Hon. M. Kennon.

Appeal from a conviction of rape; penalty, death.

The opinion states the case.

*H. E. Short,* for appellant.—On question of court's charge: Blocker
v. State, 10 S. W. Rep., 439; McLaughlin v. State, 10 Texas Crim.
App., 340; Taylor v. State, 17 id., 46; Davis v. State, 42 Texas, 226.

On question of the weight of the evidence: Kirk v. State, 32 S. W.
Rep., 1045; Hughes v. State, 23 S. W. Rep., 891; Gazley v. State, 17
Texas Crim. App., 267.

*C. E. Lane,* Assistant Attorney-General, and *Lester Holt,* for the
State.—On question of insufficiency of bill of exceptions by bystanders:
Clayton v. State, 67 Texas Crim. Rep., 311, 149 S. W. Rep., 119;
Ward v. State, 68 Texas Crim. Rep., 154, 151 S. W. Rep., 154, 1073;
Crutchfield v. State, 68 Texas Crim. Rep., 468, 152 S. W. Rep., 1053;
Misher v. State, 69 Texas Crim. Rep., 223, 152 S. W. Rep., 1049; Figuer-
roa v. State, 71 Texas Crim. Rep., 371, 159 S. W. Rep., 1188.

DAVIDSON, JUDGE.—This negro was convicted and given the death
penalty for rape on a woman whose age is shown by the testimony to be
fifty-six years.

After giving an account of her trip leaving her residence in search
of a horse that she wanted, supposed to be somewhere around the neigh-
borhood or close by, prosecutrix says she met a negro, and told about his
movements; that he passed her a time or two. We quote her testimony
in this connection from the record: "I went up there to the west fence
and I looked around and then I started back and was picking flowers
and looking at the flowers, and all of a sudden the same negro I met on
the road was in the pasture. I could see him very plain in the face, he
was about as far as from here to that second window there from me;
and when I saw the same negro that I had met on the road I got so
scared I turned around, I didn't want to meet him, and I turned around
and went to the fence and when I was at the fence I looked back and he
still was after me, and then I went under the fence, and then I thought,
'what shall I do?' and then I thought that I had talked about that horse
two times with him, so he might want nothing else only he might want
some money out of me for bringing that horse, and I didn't want to show
how scared I was and so I came back and asked him what he wanted,
and he didn't say anything, so I offered him a dollar and a half if he
brings my horse back; he didn't say anything about that, he didn't say
a word to that, and he came to me and grabbed me on my arm and then
he said something what he wanted, I didn't know what it was, I told
him, 'I don't know what that is,' and then he said it again and then
I thought what it was and I said: 'Oh, God, what do you want with
an old woman like I am?' Then he caught me on my neck and I cried
out, and then I asked him to let me go, and he said 'no,' and when he said

'no' I got so scared and I was so excited that I was half dead, and that is nearly all I can tell you; then I closed my eyes and he dragged me in some bushes and some trees. Q. Just state to the jury what he did then. A. I don't know, I couldn't tell you very plain, because I was so excited, I was nervous, I don't know what. Q. You will have to state just exactly what he did. A. When I felt him I got unconscious. Q. What do you mean by 'feeling,' just tell these gentlemen here? A. I can't tell that, no I can't, I could tell it to women but I can't tell it to men. Q. After he grabbed hold of you, you say he dragged you a piece from the fence, now just state to the jury whether or not he threw you down? A. I don't know, when he caught me on my arm and 'no' then I lost all control over me, I thought he would first assault me and then he would kill me too, I lost all my nerves and everything; when I looked up again he was gone already; he was going toward the south and had gone a good piece when I opened my eyes; when I regained control over myself I was lying on my back and my dress was up. Q. Just state to the jury whether or not he actually had intercourse with you? A. Yes, he did. Q. Are you positive of that? A. Yes, he did, I felt him, it sure went through me, and then I was gone, and after I got up everything was in my clothes, I felt him and it was in my clothes. After I came to myself I saw him going off south and then I got up and went to the gate of the pasture where I had come in. I did not give him my consent or permission to do anything like that; and I couldn't get away from him, I was too scared, I was shivering, I couldn't lift my arm or nothing, I couldn't do it, I didn't have the strength to get away." This is perhaps enough of the testimony in regard to the immediate facts, and in fact it is about the substance in the concrete. This is the language of the alleged outraged woman. Shortly after she says this occurred she passed one neighbor's house whom she said was not at home, and reached another neighbor's residence and told at that house that she had been assaulted by a negro. There is evidence going to show that appellant was in the neighborhood and could have had the opportunity; for instance, he had gone from his residence up to an uncle's to get a horse; that he went to the residence of this uncle, got his horse and returned home. The distance between the two places was about four miles. Upon his return home, approximately about three o'clock, he hitched his horse to a buggy and he and his wife went to visit her father's some eight or nine miles away. The evidence shows that he reached that place about four o'clock, perhaps a little after. Defendant testified in his own behalf that he went to his uncle's after the horse and returned home, and hitched the horse to a buggy, and he and his wife went to her father's on an invitation that day received through the mail. It is shown by his employer he received the invitation through the mail. The employer testified to that, and defendant having no horse, went to his uncle's after a horse for the purpose of this visit. One or two witnesses in an indirect rather indefinite way gave evidence tending to show that they saw defendant between

his home and the residence of his uncle, but as that is not a disputed point, it is unnecessary to mention this testimony. Of course, he traveled the distance from his house to his uncle's and back in getting the horse, and to this he himself testifies, and in fact there is no question about that matter. He denies the whole transaction testified by the prosecutrix. He says he did not have intercourse with her; he did not see her under the circumstances and at the place that she mentions. He proves an alibi, and in fact he denies the matter from every standpoint of his testimony. He also testifies that while he was going back from his uncle's he met another negro, who was riding a similarly colored horse to his except that that negro's horse had some white in his face, or bald face. So he puts this negro in the neighborhood with practically the same opportunity that he, the defendant had, or as the witnesses' testimony goes to show, that he had.

This matter occurred on Saturday. Appellant reached his father-in-law's house something like four o'clock in the evening Saturday, and Sunday morning before day, about four o'clock, he was arrested and carried into the presence of prosecutrix. She declined to recognize him and gave her reasons why. She says, "I remember them bringing the defendant to my house that night and I examined him closely and had him to take off his coat and stand up, and I said at that time it was the figure and the color of the man that assaulted me, but he didn't have his hat on, so I said he didn't look that way that night, I said I couldn't state that he was the man. I said the other man's face was more round, but I told them it was the figure of the man and it was the color; I didn't say that the man that assaulted me was taller than the defendant; I said the face looked different to me then, but at night I couldn't see, my eyes are not good." On the next morning she took another look at him and recognized the defendant as being the man. In connection with her failing to recognize him definitely at night, and her recognition of him the following day, there was quite a lot of questions asked and answers elicited. He did not have his hat on at night was one of the main reasons why she says she failed to recognize him, and he did have on his hat the next day.

Appellant reserved a lot of bills of exception. He excepted to the following charge: "There is evidence before you to the effect that the witness Annie Dittmar stated, when the defendant was carried before her on the night of the alleged rape, that the defendant was not the person who raped her and if there is evidence before you that the next day, with the defendant before her, she stated that he was the person who committed the rape, you are instructed that you must not consider the latter statement of said witness as evidence tending to show the alleged guilt of the defendant, but you may consider it, for what you may think it worth, in determining the weight to be given the testimony of the said Annie Dittmar as a witness in this cause upon that point." Various objections were urged to this charge, among others, that it is

on the weight of evidence, etc.   We are of opinion the charge is upon the weight of evidence.   It selects out the fact that on the morning after she had failed to recognize the defendant the previous night, that she did recognize him on the following morning and so testified before the jury.   Now the court instructed the jury they could not consider this as any evidence of guilt, but they could give it what credit they thought it was worth in passing on the credibility of the prosecutrix upon that particular point.   What point?   Evidently the identification of the defendant the next morning when he was brought before her.   Appellant had introduced evidence tending to show that she did not recognize him the previous night.   The State met this to some extent at least, or sought to do so, by showing she did recognize him the next day in the daylight. Her testimony was not attacked as to her recognition of him in the day-time.   She had been to some extent attacked by showing that she failed to recognize the negro the night before.   The fact that she testified to identity the next morning was a circumstance in the case and evidently used by the jury against the defendant.   The court under-took to limit this in passing on the weight of her testimony upon the question of identity.   This was a charge, it occurs to us, on the facts on a particular question, one phase of the evidence culled from the other testimony and called direct attention to the jury, and they were told they might consider that testimony upon the question of identity.   Iden-tity was one of the crucial points of the case; it was the point about which the issue of this case hung.   The old woman identifying the defendant as best she could, and he denying his presence at the time and place, and proved by facts and circumstances, and his own positive testimony, and that of his wife, that he was at a different place.   If the old woman was certain of her identity of the man, then the case was made out, or at least it was cogent evidence going to show that he was the man who had outraged her.   If she was not correct about this, then in that event appellant may not have been the man.   So it will be seen that one of the crucial questions and points in this case was the identity of this defendant as being the man who the old woman says outraged her person.   It occurs to us this was not introduced to attack her credibility, but to corroborate.   Had the charge limited the question of credibility to failure to recognize, there might have been no error. As given the charge virtually instructs the jury that the "next morning" identification of defendant corroborated prosecutrix's evidence on trial.

Another bill of exceptions recites that the prosecuting attorney in his closing argument to the jury continually referred to mob violence in such cases, and repeatedly held up before the jury and threatened them with the statement that unless they assessed the death penalty in this case, then the people would take the law in their own hands in the future, and that such rape fiends as the defendant would be dealt with at the hands of a mob, and then the prosecuting attorney, Mr. Holt, made use of such expressions as the following, over the pro-test of the defendant: "It is true that the people often take the law

in their own hands and mob persons that commit rape, and I want to tell you why that is true. Such attorneys as Mr. Short who represents the defendant pull the wool over the eyes of a jury and get them to return a verdict of not guilty. I tell you that if you turn this defendant loose then you can not blame the people for taking the law in their own hands. Mr. Short has tried to frighten you with a picture of a scaffold, but, gentlemen, do not allow yourselves to become frightened. It would be much worse than convicting an innocent man for you to turn this defendant loose and then in a week or two for him to rape one of your wives, sisters, or daughters." This argument and the like expressions of the district attorney were promptly objected to by the defendant through his counsel, and the court was requested to stop the district attorney from using such expressions, and to instruct the jury not to consider such argument, because the same were highly inflammatory and reasonably calculated to prejudice the minds of the jury against the defendant. The court signs the bill with this qualification: "This bill is disallowed. The court can not recall the argument of the district attorney, but at no time was the court called upon to stop him, or requested to 'instruct the jury not to consider such argument.'" Then follows an approval by bystanders of the bill:

"We, the undersigned citizens of the State of Texas, hereby attest that we are fully informed and understand the contents of the foregoing bill of exceptions; that we were bystanders in the court, and present when the matters related in said bill of exceptions occurred, and we are fully cognizant of said matters, and the said bill of exceptions, which the judge presiding at said trial has refused to sign, is correct, and truly present the facts as they really transpired.

"Witness our signatures on this the 24th day of June, A. D.. 1913.

(Signed)   Chas. A. Wyman,
P. H. Ransome,
R. B. Mayes.

This was properly sworn to before the clerk of the District Court. This bill seems to be in compliance with the statute; it was in no way contested. The statute provides means and methods by which a contest may be had under such circumstances, but it was not had in this case. We, therefore, take the bill as we find it. Of course, such speeches, arguments and remarks as are found in this bill of exceptions ought not to occur. The defendant's life, if it is to be taken, should be taken under the forms and solemnities of the law. Rape is considered by our people, we may be justified in saying, as one of the heinous crimes, and one which seems to excite our people sometimes beyond the bounds of reason, eventuating in the fury of mob violence even to burning at the stake. Therefore, the prosecution and the court should look well that the feelings of the "people" should not be dragged into the courts and before juries in trial of cases under charges of rape. Here was a negro charged with rape upon an elderly white woman. The passions of the

mob feeling were held up by the prosecution in his speech before the jury, and the jury urged to convict this man to prevent mob law, and he appealed to the jury if they should turn this defendant loose they could not blame the people from taking the law into their own hands. Taking the law into their own hands about what and against whom? Against the negro if he was acquitted, or against the jury for acquitting him. The juries are not to try the accused and hang him to keep mobs from hanging them or him. If the accused in a capital case is to forfeit his life, it should be done under the most solemn forms of the law. The courtroom and the courthouse and the judicial system are organized not to convict upon mob law or by mob violence, but to convict under the due process of law guaranteed by the Constitution and laws of our country. No man's life, liberty or property shall be taken except under due process of the law of the land. This is one of the solemn guaranties reserved in the Bill of Rights. We call especial attention to this sentence: "It would be much worse than convicting an innocent man for you to turn this defendant loose," etc. We do not know of a worse condition that could possibly arise in a civilized community and in the enlightened jurisprudence of this country than the proposition to convict an innocent man rather than turn this defendant loose. If he should be innocent, then under this statement of the district attorney it would be better to convict him than to turn him loose for fear that in a week or two one of the wives, daughters or sisters of some juryman might be insulted. Expressions like this should not be indulged in a courtroom, and should not be approved by either the trial or appellate court. The courts of this country can not subscribe as a part of its jurisprudence that it is worse to convict an innocent man than to return a verdict of not guilty against an accused person. In other words, apply that directly to this case: it would be worse to turn this defendant loose for fear he might ravish somebody else than it would be to convict him though he be innocent. If prosecuting officers will continue to make such appeals and to use such arguments, if they be arguments, before a jury, it will be the duty of this court at all times under such circumstances to reverse the judgment, and see that the accused is convicted only under the due process of the law of the land. Branch's Crim. Law, sec. 62; Smith v. State, 44 Texas Crim. Rep., 137; Powell v. State, 70 S. W. Rep., 218; Thompson v. State, 33 Texas Crim. Rep., 472; Conn v. State, 11 Texas Crim. App., 390, and other cases cited by Mr. Branch.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

PRENDERGAST, Presiding Judge, and HARPER, Judge.—We do not think any error is shown in the charge of the court, and if error it would be error in favor of the defendant, but agree to the reversal of the case solely on the remarks of the district attorney.

ON REHEARING.

February 4, 1914.

DAVIDSON, JUDGE.—The State has filed a motion for rehearing, and attaches a lot of affidavits attacking a bill of exceptions found in the record. It is unnecessary to repeat this bill of exceptions as it is fully set out and discussed in the original opinion. We are of opinion there is no such merit in the motion for rehearing as would authorize or require this court to change its ruling. The affidavits attached to the motion for new trial can not be considered. This is an appellate court and matters of the character sought to be brought in review before this court are dehors the record and not permissible. This has been the rule in Texas, and was thoroughly gone over in the opinion by Judge Harper in Pye v. State, 71 Texas Crim. Rep., 94. The Pye case has been followed in several subsequent decisions, some of which have been rendered at the present term of the court.

We are of opinion that the bill of exceptions is sufficient to present the question set forth and contained in it. The bill of exceptions was presented to the judge and he refused it, stating that he did not know what the remarks of the district attorney were but that he knew the matter was not called to his attention. Based on this refusal appellant proved up his bill by bystanders. This was in accordance with the statute. It was filed within the thirty days allowed by law. There was no contest over it, and no attempt to contest it in the court below. That contest is sought to be made here by the affidavits connected with the motion for rehearing. This bill of exceptions is within the provisions of the statute, and is almost if not identically the same question decided in Johnson v. State, 42 Texas Crim. Rep., 298, in an opinion by Judge Brooks. See also Branch's Crim. Law, sec. 52, for other cases.

The motion for rehearing is overruled.

*Overruled.*