[Crim. No. 1294.  Second Appellate District, Division Two.—February 7, 1927.]

## THE PEOPLE, Respondent, v. JENNIE LAURA BROWN et al., Appellants.

[1] CRIMINAL LAW—MURDER—CONSPIRACY—EVIDENCE—HEARSAY. — In this prosecution for murder, in which several defendants were sought to be convicted upon the theory that one of the defendants, a foster-parent of the deceased, conceived and progressively forwarded a scheme and design to poison the minds of the other defendants against the deceased, and conspired with them to harass and discourage him until he should abandon his ranch properties and life insurance to said foster-parent, the trial court committed prejudicial error in permitting witnesses for the prosecution to testify to hearsay statements of the deceased and others tending to show the existence of gross unpleasantness and discord between defendants and the deceased.

[2] ID.—EXPERT TESTIMONY—PROBABLE POSITION OF PERSON—CHANGED CONDITIONS.—It cannot be said as a matter of law that the knowledge of a chemist as to the probable position of a person from whose wounds blood may have flowed is more certain or reliable than that of the jury having before it all the facts and circumstances; nor should the jury be required to accept as an expert opinion the conclusion of an investigator upon matters which may not have borne the same appearance or relationship at the time of his investigation as that existing at the time of the happening of the event, some two months previously.

[3] ID.—COMMON OBSERVATION AND EXPERIENCE—EXPERT TESTIMONY. A person skilled in art, trade, or science, and having knowledge in relation to matters which are not within the grasp of men of average intelligence, education, and experience, may express an opinion on a state of facts within his specialty and involved in the inquiry, but an expert will not be permitted to express his opinion as to conclusions from matters of common observation and experience.

[4] ID.—MOTIVE—EVIDENCE—WILL—KNOWLEDGE.—In such prosecution for murder, the trial court should have sustained defendants' objection to the introduction in evidence of the will of the de-

2.  See 11 R. C. L. 586; 10 Cal. Jur. 971.
3.  See 11 R. C. L. 572; 10 Cal. Jur. 957.
4.  Admissibility of evidence of other offenses generally, notes, 44 Am. Rep. 299; 105 Am. St. Rep. 976. See, also, 8 Cal. Jur. 38.

ceased, which was offered and received as evidence tending to support the element of motive, where such will had been executed more than ten years previously and there was no evidence indicating that any of the defendants had knowledge of its existence.

[5] ID.—CRIMINAL DESIGN—OTHER CRIMES.—In such prosecution, the trial court did not err in permitting a sister of the deceased to testify to facts constituting another crime, where such facts were offered and received as tending to establish criminal design of a premeditated character in carrying out the felonious scheme to secure the property of the deceased, as well as that of said sister.

[6] ID.—CRIMINAL PROSECUTIONS—FUNCTION OF GRAND JURY — LEGAL REPRESENTATIVE—INSTRUCTIONS. — A grand jury is not concerned with the employment of prosecuting attorneys, nor with the obtaining of convictions, and the district attorney does not appear as spokesman for the original body before a trial jury; and in this prosecution for murder it was error for the trial court to refuse to admonish the jury to disregard statements of a special prosecutor, during his closing argument, wherein he stated that any reflection cast upon him or his presence by defendants was not upon him personally, but as a representative of the state, of the citizens of the county, and "as a representative of the grand jury of this county."

[7] ID.—REFUSAL OF FORMER JUDGE TO REPRESENT DEFENDANTS — IMPROPER ARGUMENT.—In such prosecution, it was improper for the special prosecutor, in his closing argument, to state that a former judge, naming him, who had served the county for over twenty years, was asked to defend the accused for a nice fat sum but he "wouldn't do it because he couldn't look the citizens of this county in the eye and do it like a man," where there was no evidence of this nature in the record, and said judge was not of counsel for the prosecution and, therefore, it was impossible for the defendants by examination of the jurors to determine as to whether or not he may have then represented some or all of them, or whether his views would tend to influence them one way or the other.

[8] ID.—VERDICT OF CORONER'S JURY — GUILT OF DEFENDANTS — EVIDENCE—IMPROPER ARGUMENT.—In such prosecution for murder, it was improper for the special prosecutor, in his closing argument to state to the jury that there "must have been something in that testimony that did not convey innocence to that coroner's jury, for the reason that they didn't absolutely give them a clean bill of health. . . . We know that these particular people on that ranch at that time are guilty of murder. We know that they struck this man," where there was no evidence in the record upon which such statements could legitimately be founded.

[9] ID.—SILENCE OF DEFENDANTS — MISCONDUCT OF PROSECUTING AT-
TORNEY—PREJUDICIAL INSINUATIONS.—It is the inviolable right of
the defendants to remain silent, for any reason whatever, or for
no reason, without subjecting themselves to comment of counsel or
consideration of that fact by the jury; and in such prosecution it
was prejudicial misconduct for the special prosecutor to make
prejudicial insinuations, or worse, concerning the failure of the
defendants to testify, and it was also prejudicial misconduct for
counsel to suggest that the jurors take the law into their own
hands.

[10] ID.—UNWARRANTED ARGUMENT—APPLAUSE FROM AUDIENCE — IN-
STRUCTIONS—PREJUDICIAL ERROR.—In such prosecution, if the un-
warranted argument of the special prosecutor, consisting of an
extended inflammatory attack upon the defendants and their
counsel, which was permeated by significant exhibitions of appeal,
invective, and demands for conviction which could have and
doubtless did arouse the passion and prejudice of the jury no less
than that of the other listeners, lacked damaging influence and
coercion, the deficiency was supplied by the applause and cheers
from the audience, reinforced by the weight of the rulings of
the court approving said prosecutor's conduct and refusing to
admonish the jury, resulting in prejudicial error.

[11] ID.—VISIT TO SCENE OF CRIME—EVIDENCE—INVALID INDICTMENT.
Where, without any court order, a grand jury visits the scene
of the crime, where witnesses are examined and the circumstances
of the crime are re-enacted by persons not authorized to appear
before the grand jury, the defendants' motion to set aside the
indictment should be granted.

[12] ID. — PRIOR CONTRADICTORY STATEMENT — IMPEACHMENT OF OWN
WITNESS.—In such prosecution, a witness called by the People
having been asked to tell what he saw when he came by the
residence of said foster-parent, to which he replied that he saw
nothing except three automobiles standing in the yard, it was
not error to permit the district attorney to impeach the testi-
mony of said witness by showing that at a stated time and place
said witness had told certain persons that when he passed the

9.  Comment of counsel on failure of accused to testify, notes,
3 Ann. Cas. 164; 20 Ann. Cas. 1273; Ann. Cas. 1917D, 279. See,
also, 8 Cal. Jur. 268.

10.  Demonstration by or misconduct of spectators during criminal
trial, notes, 12 Ann. Cas. 645; 12 L. R. A. (N. S.) 98; L. R. A.
1918E, 950. See, also, 26 R. C. L. 1020.

11. · See 13 Cal. Jur. 77.

12.  See 27 Cal. Jur. 174.

ranch of said foster-parent he saw the deceased "staggering out the back door like a chicken with his head cut off." (Opinion of supreme court on denial of hearing.)

(1) 16 C. J., p. 624, n. 16, p. 885, n. 58 New; 17 C. J., p. 332, n. 64; 40 Cyc., p. 2559, n. 65. (2) 16 C. J., p. 749, n. 56 New. (3) 16 C. J., p. 748, n. 50, 51. (4) 30 C. J., p. 188, n. 65. (5) 16 C. J., p. 601, n. 37; 30 C. J., p. 193, n. 53. (6) 16 C. J., p. 909, n. 46. (7) 16 C. J., p. 897, n. 93. (8) 16 C. J., p. 898, n. 96, p. 908, n. 40. (9) 16 C. J., p. 901, n. 35, p. 909, n. 46; 17 C. J., p. 301, n. 49. (10) 16 C. J., p. 810, n. 77, p. 916, n. 47; 17 C. J., p. 300, n. 43, p. 303, n. 67 New. (11) 28 C. J., p. 801, n. 38, p. 805, n. 11, p. 812, n. 24; 31 C. J., p. 807, n. 81. (12) 40 Cyc., p. 2559, n. 65.

APPEAL from a judgment of the Superior Court of Kings County and from an order denying a new trial. K. Van Zante, Judge. Reversed.

The facts are stated in the opinion of the court.

Crosby, Naus & Crosby, George L. Reimbold and J. C. C. Russell for Appellants.

U. S. Webb, Attorney-General, John W. Maltman and John L. Flynn, Deputies Attorney-General, and William R. McKay, District Attorney, for Respondents.

CRAIG, J.—The appellants and one Robert McCammish were jointly charged by indictment with having on the fourteenth day of December, 1924, in the county of Kings, wilfully, unlawfully, feloniously, and with malice aforethought killed and murdered one Lee Camp. Appellants were convicted of murder in the second degree, and McCammish was acquitted. Motions for new trial were denied, and the respective appeals from the judgments and rulings upon such motions are presented together. All of the parties adopt as substantially correct the statement of facts set forth in the briefs of appellants Brown and Tipton.

From such statement, and from a careful perusal of the voluminous record in this case, it appears that the whole controversy revolved around the question as to whether or not Jennie Laura Brown instigated and conspired with her co-defendants to perpetrate the alleged murder of Lee Camp. It is admitted that the latter received an injury, either

through accident or a felonious assault, from which he died within a few hours thereafter. It was the theory of the prosecution that Camp was struck on the head with a cog-wheel which lay near a windmill tower on the premises of Mrs. Brown, whereas, the defendants insisted that he fell from the tower, striking his head on the wheel. The evidence in this respect is wholly circumstantial. None of the defendants testified at the trial, and no one other than the three appellants appears to have been upon the ground at the time of the occurrence in question. W. Stanton Brown, the husband of appellant Jennie Laura Brown, testified that he was ill and in bed, and that his wife was in the room with him, until someone called her from downstairs to "come quick"; that he heard a voice on the telephone summoning a doctor to "come to the Brown ranch immediately; an accident," and that within a few minutes he "heard two people crying" on the floor below. Tipton testified before the coroner's jury that he and Camp were preparing to remove a large windmill fan from the tower; that the witness had gone to a shed and was gathering up some ropes; that he returned to the tower within about twenty minutes, whereupon he discovered Camp lying "kind of on his side," on a brick pavement at the base of the tower, and saw that Camp had been injured; this witness further swore, however, that he did not know that the man had been on the tankhouse; that he "didn't see him at all, or didn't see him fall or never heard him"; that Mills soon drove up in his automobile, and was told to telephone for a doctor, soon after which a Chinese employee named Lee Gum appeared on the scene. McCammish appears to have been visiting a neighbor at the time. Shortly thereafter a doctor arrived, followed by an ambulance, and Camp was removed to a hospital, where he died that afternoon.

Autopsies which were performed on the following day and six weeks later showed that the crown of the head was intact, but that the upper part of the occipital bone and the lower part of the two parietal bones "were a mass of small pieces," and that portions of the skull had penetrated the brain. About twenty "peculiar shaped marks," apparently such as would result from contact with the cogs on the wheel mentioned, and of a bluish color, appeared

on the posterior area of the scalp. There was a small blue scar on the right temple, and a bruise on the left hip, but no other blemish was found on the body.

It appears that the deceased was eleven years of age when, in 1901, he and his sister, Pearl Camp, were taken by the Browns to rear and educate, and that he had continued to reside with them until the date of his death. He received an interest in certain real property near the Brown ranch, title to which he conveyed to Mrs. Brown, and carried life insurance of approximately $80,000, of which the latter was named as beneficiary, and she had agreed to at least assist in paying the premiums thereon, which amounted to $2,700 to $3,000 per annum. McCammish was a relative of Mrs. Brown, and had lived on the same ranch for a period of seventeen years; Tipton was her uncle, and at Camp's suggestion had been employed to assist in managing the ranch properties during the four months next preceding the latter's demise; Mills had known Stanton Brown for many years, had nursed him in his illness, and continued to visit him.

[1] It was contended on behalf of the People at the time of the trial that the defendant Jennie Laura Brown had conceived and progressively forwarded a scheme and design to poison the minds of Tipton, McCammish, and Mills against Camp, and conspired with them to harass and discourage him until he should abandon the ranch properties and his life insurance to her. In attempting to prove the existence of gross unpleasantness and discord among said parties in furtherance of such conspiracy and design, several witnesses were called by the district attorney, who were permitted to testify to many hearsay statements of the deceased and others. Strenuous objections to each question propounded to such witnesses were interposed, upon the grounds that it called for irrelevant, incompetent, immaterial, and hearsay testimony which did not tend to prove any issue in the case. The defendants moved to strike out each such answer, upon the same grounds. All of the objections so made were overruled by the trial court, and the motions to strike were denied. These rulings are here assigned as prejudicial error. The testimony of this character covers an extensive field in the record, and we need only to detail a few excerpts therefrom.

The People's witness Theresa Lindauer, testified that seven months before he was injured Lee Camp visited her, and that he asked ''if I knew anything about how he could cash in on his insurance in order to get the money ahead, as he didn't have very much on hand, and I told him to go take a note, I did not know anything about it, and then he told me that he would not be able to leave the place just then on account of the condition in which his land and his money was tied up, and if he left now he would not have anything''; that in July, five months before Camp died, ''he told me about the trouble he was having at home''; ''he came out and told me that his relations at home were quite unbearable and that his clothes at this time had been taken away from him and had been hidden so that he would not be able to go out at any time''; ''and then he told me also that he didn't think he would be able to stand it very much longer, as the day before he had gotten a tongue lashing, the worst he had ever gotten in his life before.'' The witness Alfred Brown testified: ''Lee told Frank Marciel he didn't want to go home any more, because he was having lots of trouble''; Lambert swore that ''He stated that he had been the goat on the ranch for three years, and that he had tried to get a settlement with them the year before, but that they wanted to sell out to him or either sell the property and divide the money''; and People's witness Roberts testified: ''He said there had been another row up at the breakfast table over the drawing up of the three-year lease, between himself and Uncle Johnnie (Tipton); and Mr. Camp stated that if Uncle Johnnie didn't keep out of his business he was going to knock his damned head off. He didn't know what he was around there for, anyhow.''

The foregoing and much other such testimony constituted the only evidence of the fact to which they related, and we are unable to find elsewhere in the record any evidence from which the jury would have been justified in concluding that there existed a common understanding among the defendants which was intended to accomplish purposes detrimental to Lee Camp. That such was the object of offering it is not questioned, and the district attorney elaborated upon the strifes mentioned in his closing argument to the jury. He there said, in part:

"Now, then, unless they are going to tell you that they think the testimony of Lee Camp is to be disbelieved, for the purpose for which it was introduced, namely, as to the conditions on that farm, unless they are going to put him in the same category that they have put every other citizen who has had anything to do with this case, that they are perjurers, you have got to accept that as the truth and the fact, and therefore, on this particular morning, at this particular time, if you please, isn't it very significant that that was the time when the final crisis was coming between Mrs. Brown and Lee Camp? That was the final moment when the mission of Tipton upon that farm was going to be called into play, as to whether her interests, Mrs. Brown's, was to be subserved, or whether Lee Camp was to get out."

Judgments have repeatedly been reversed in this and about every other jurisdiction in this country wherein hearsay testimony of the character above noted has been introduced. In *People* v. *Irwin,* 77 Cal. 494 [20 Pac. 56], our supreme court, quoting with approval from *People* v. *Carlton,* 57 Cal. 84 [40 Am. Rep. 112], said:

"This testimony was not a part of the *res gestae,* and was not admissible under the authorities to which reference has been made, nor upon any theory or principle of law with which we are acquainted. From it injury might readily have resulted to the defendant, for it might have been, and probably was, argued therefrom that deceased intended to resort to the courts rather than to force for redress, and therefore did not commence the rencounter in which he lost his life.' . . . Such declarations depend for their force upon the veracity of the deceased, or the party who has been assaulted, are highly prejudicial (*State* v. *Pomeroy,* 25 Kan. 350), and are regarded as being so grievously injurious that in one case it was held the judgment must be reversed, although no objection was made to the evidence when offered. (*People* v. *Williams,* 3 Abb. App. (N. Y.) 600.) There is no analogy between such statements and dying declarations; for the latter, being made in view of immediate death, have all the sanction and solemnity of testimony given under oath before the court and jury. . . . '

"But it is claimed by counsel for respondent that these declarations were admissible in evidence to prove con-

spiracy, and the court seems to have allowed them for that and no other purpose; that is to say, the main fact which they are supposed to explain is the alleged conspiracy, and not the killing. In other words, it is admitted by counsel for respondent, as we understand the matter, that if there was no question of conspiracy in the case, a declaration of deceased that Irwin was making preparations to kill him, and would kill him unless he left the country, would be inadmissible. This must be admitted. Such a declaration is on a par with the one referred to in *People v. Carlton, supra,* and, as said there, 'not admissible upon any theory or principle of the law with which we are acquainted.' '' .

In *People v. Gress,* 107 Cal. 461 [40 Pac. 752], a witness was permitted to testify that the deceased had told the witness of domestic difficulties which he was experiencing on account of the attentions of the defendant to decedent's wife; that the deceased had said, ''I am in trouble. . . . I want to save my boy, and that's my hurry for coming here.'' In reversing a judgment of conviction in that case it was said: ''This evidence was clearly hearsay, and was wholly inadmissible upon any possible theory of the case, or upon any principle or rule of evidence known to the law. It is no less hearsay because the declarations were those of the deceased, since proof of such declarations are only admissible when made *in extremis*—dying declarations, having reference to the circumstances of the death, or when they constitute a part of the *res gestae.* (*People v. Carkhuff,* 24 Cal. 642.) In this case they were neither.'' To the same effect are *People v. Landis,* 139 Cal. 426 [73 Pac. 153], and *People v. Driggs,* 12 Cal. App. 240 [108 Pac. 62]. From the foregoing the inevitable conclusion is that the admission of the declarations in question constituted reversible error.

The respondent cites many authorities from other jurisdictions, but were they even persuasive we should be compelled to recognize and follow the rule uniformly denounced in all analogous decisions in this state.

*People v. Wright,* 167 Cal. 1 [138 Pac. 349], cited by respondent, upheld the admission of extrajudicial statements of a woman as to her condition of pregnancy in a prosecution for murder by abortion. Such evidence was not there offered to show motive on the part of the defendant, but

to establish a condition necessary to proof of the commission of the offense. *Rogers* v. *Manhattan Ins. Co.*, 138 Cal. 285 [71 Pac. 348], held that proof of suicide would obviate the necessity for waiting seven years to establish liability upon a policy of insurance in cases otherwise falling within the requirements of subdivision 26, section 1963, of the Code of Civil Procedure. Neither of these cases is in point.

A witness called by the People was asked to "Tell us what you saw at that time when you came by" the Brown residence, to which he replied that he saw nothing except three automobiles standing in the yard. The district attorney then propounded the following question:

"Isn't it a fact, Mr. Garcia, that about three or four days after Mr. Camp died that you were over in Bettencourt's barber shop, here on Doughty street, in the city of Hanford, and you told Mr. Bettencourt and his father there that on the morning of December 14, 1924, when you came by Mr. Brown's ranch early in the morning that you saw Lee Camp staggering out the back door like a chicken with his head cut off?"

Strenuous objections were at once interposed by the defendants, upon the grounds that such questions and line of examination were but an attempt to impeach the People's own witness, that no proper foundation had been laid, that the prosecution had not shown that they were taken by surprise, that the witness had given no testimony contrary to any statement embodied in the question, that it called for hearsay testimony, and that it was incompetent and immaterial. Thereupon the district attorney was sworn, and testified that Garcia had promised to come into court and "tell the truth" as to a statement which he had made to the barber. The witness was then recalled, and, over the same objections, swore that he had previously been examined by the district attorney for a period of three hours, during which the latter "talked to him kind of rough"; that he had informed the district attorney at that time that all he saw was three machines in the yard; that a person passing the Brown ranch could see "just the front door"; "You can't see the back door." Bettencourt and two other witnesses were then called by the People, and each, over the objections by defendants upon all the grounds heretofore recited, testified that Garcia had made the statements em-

braced in the question quoted above. Bettencourt added to his answers the following: "I says, 'like a drunk man?' He says, 'No, worse than that. Like a chicken with the head cut off.'"

Appellants insist that the testimony of these witnesses was hearsay, that it did not tend to contradict any testimony given by Garcia from the stand, and that it was inadmissible for any purpose. The respondent relies upon sections 2049 and 2052 of the Code of Civil Procedure, and cases construing them.

Said sections merely provide that under proper conditions a party may impeach his own witness by showing that he has made, at other times, statements inconsistent with his *present testimony*. While, standing alone, it was perhaps not seriously prejudicial to the rights of the defendants, we think it was error to have received this testimony. The rule which permits one to impeach his own witness in the manner specified by the code sections just mentioned is subject to certain qualifications. It must be remembered that ordinarily one who calls a witness to the stand vouches for his veracity. Again, proof that the witness has made statements out of court is generally refused admission, because it is hearsay. In order to avoid exclusion upon these and no doubt other considerations, it must first appear that some competent purpose is to be subserved. To put a witness on the stand merely to impeach him is not permissible. (*People* v. *Crespi*, 115 Cal. 50 [46 Pac. 863].) The only object which will justify impeaching a witness by showing that he has made other statements different from those given upon the trial, is to detract from his credibility, in order that other testimony given by him may carry less weight with the jury (*People* v. *Godwin*, 123 Cal. 374 [55 Pac. 1059]), for the impeaching statements cannot be considered for the purpose of establishing the truth of the declarations themselves. (*Thiele* v. *Newman*, 116 Cal. 571 [48 Pac. 713]; *People* v. *Mitchell*, 94 Cal. 550 [29 Pac. 1106].) In the instant case, it is true that if Garcia made the statements attributed to him at the barber-shop, it might be assumed that they were inconsistent with his testimony to the effect that he saw nothing except the machines as he was passing the house from which Camp was supposed to have emerged. But this was the only testimony which

Garcia gave. To permit his impeachment could accomplish
no purpose except to show that he was not worthy of belief.
Proof that he made the declarations attributed to him at
the barber-shop could not be considered by the jury in
determining whether or not such statements were true, and
therefore the impeachment should not have been permitted.

Garcia as a witness testified that he "saw nothing except
three machines." Now, if he be impeached, the net result
is to prove that this statement is not to be believed, and that
he did not see the machines. The People's case was no
better off to have the jury conclude that Garcia did not
see three machines than to have his statement that he did
see them accepted as true. It is only when the evidence
produced has resulted in injury to the cause of the party
producing the witness that sections 2049 and 2052 may be
made the bases of impeachment of the witness giving it.
(*People* v. *Jacobs,* 49 Cal. 384; *People* v. *Conkling,* 111 Cal.
616 [44 Pac. 314]; *People* v. *Mitchell, supra; People* v.
*Godwin, supra.*)

It is argued by the respondent that this rule was waived
by the defendants. It appears that during argument as to
the admissibility of such evidence the district attorney re-
marked that Garcia had been in his office, and proceeded to
detail the circumstances. One of the counsel for defendants
demanded that the district attorney be sworn and take
the stand, which he did, but objections were immediately
interposed to his stating any of his alleged conversation with
Garcia, and repeated comprehensive objections were continu-
ously interjected to each question propounded to the district
attorney while testifying. We think the request of the
defendants amounted to nothing more than a legitimate
precaution against the district attorney making unsworn
statements as to matters which were objectionable as being
incompetent. If constrained to state what occurred, and ap-
parently indicating that he would do so, it was but proper
that he be sworn and testify as any other witness, and
subject to the same rules of evidence and objections by his
adversaries.

[2] Two experts, a chemist, and a crime investigator,
were called as witnesses for the defendants, and each tes-
tified to the results of his inspection. The chemist swore
that certain spots on the premises and on the wearing

apparel of the deceased consisted of human blood. When asked during his direct examination as to the direction from which the blood appeared to have emanated, objections on behalf of the People upon the ground that the questions did not call for expert testimony, and that if given it would invade the province of the jury, were sustained. The other witness testified to measurements and relative locations and conditions. He then volunteered the statement that certain markings which he discovered "all lay on a single parabolic line with respect to their position above one another," according to his computations and experiments, which statement was stricken out on motion of the district attorney.

It is contended that these rulings were prejudicially erroneous, and in violation of the constitutional rights of the defendants to be heard. We think such contention is untenable. It appears that almost immediately after the injury received by Camp the Chinese laborer heretofore mentioned carefully scrubbed the wheel, bricks, and concrete walk, in an endeavor to remove all blood spots, and to "clean up everything." The two experts did not investigate until nearly two months thereafter, when conditions obviously were not, in many respects, the same as those existing at the time of the commission of the alleged offense. At all events, it cannot be said as a matter of law that the knowledge of a chemist as to the probable position of a person from whose wounds blood may have flowed is more certain or reliable than that of the jury having before it all of the facts and circumstances. Nor should the jury be required to accept as an expert opinion the conclusion of an investigator upon matters which may not have borne the same appearance or relationship in February as that existing in December, and as to which his problematical guess could be no more authentic than their own.

[3] It is well settled that an expert will not be permitted to express his opinion as to conclusions from matters of common observation and experience. A person skilled in art, trade, or science, and having knowledge in relation to matters which are not within the grasp of men of average intelligence, education and experience, may express an opinion only on a state of facts within his specialty and involved in the inquiry. (*People* v. *Heacock,* 10 Cal. App. 450 [102

Pac. 543] ; *People* v. *Willis,* 70 Cal. App. 465, 474 [233 Pac. 812].)

[4] It is next insisted by appellants that the admission of Lee Camp's will in evidence constituted error. The respondent concedes that it was offered and received over the objection of the defendants as evidence tending to support the element of motive for the commission of the alleged murder. It appears, however, that the will had been executed more than ten years prior to December 14, 1924, and, so far as we are able to discern from the record, neither of the defendants had any knowledge of its existence. Assuming, therefore, from the defendants' viewpoint, that no will existed, it is impossible upon any theory that any act of theirs could have been influenced thereby. Appellants' objections to the introduction of this document should have been sustained.

[5] Appellants complain that the trial court erred in admitting in evidence the testimony of Pearl Camp, sister of the deceased, as to facts asserted to constitute another crime. The witness swore that during her girlhood Mrs. Brown had grossly mistreated her, compelled her to do manual labor on the ranch, and had attempted to injure her by inserting phonograph needles in capsules of quinine which had been prescribed for her. It was the theory of the prosecution that the defendant Brown had for a period of years conducted a campaign of merciless persecution against the Camp children, for the purpose of causing estrangement between them, and it in fact appears that they had not spoken to each other for some time previously to the injury and death of Lee Camp. It was claimed that Mrs. Brown planned by alienating the affections of Pearl Camp for her brother to curtail or terminate his outside source of advice and counsel, and thus to control his actions. The incident of the phonograph needles is but one of numerous acts related by the witness and offered as tending to establish criminal design of a premeditated character in carrying out the felonious scheme to secure Camp's property, as well as that of his sister. We think, therefore, that the testimony in controversy was properly admitted.

[6] A special prosecutor for the People during his closing argument made numerous statements which the defendants assigned as misconduct, and requested that the jury

be admonished to disregard, which the trial court declined
to do. We quote excerpts therefrom, as follows:

Stating that the defendants had reflected upon counsel
for the People during the trial as being unfair, the special
prosecutor continued: " . . . but whenever they cast any
reflection upon me or my presence here, they are not casting
it nor any part of it upon me as an individual, but they
are casting it upon me as a representative of the state of
California, as a representative of the citizens of Kings
county, as a representative of the grand jury of this county,
if you please.''

A grand jury is not concerned with the employment of
prosecuting attorneys, nor with the obtaining of convictions,
and there is no reason that this grand jury should have
interested itself in the case beyond its investigation in dis-
regard of any possible defenses which the defendants might
have had. Their opinions, derived from a consideration of
but one side of the issues, amounted to no more than a
conclusion that the case should be fairly tried by twelve
peers of the defendants, upon all of the evidence, and it is
neither in consonance with legal principles nor true in fact
that the district attorney appears as spokesman for the
original body before a trial jury.

[7] It was argued, further: ''There is a man who was
former judge of the superior court of this county that was
asked to defend them for a nice big fat sum, and that man
wouldn't do it because he couldn't look the citizens of this
county in the eye and do it like a man—Judge Short of
this county, and these are the defendants. . . . Judge
Short's first term of office began in November, 1898, and he
served continuously thereafter until the first Monday of
January, 1907. He then retired for one term, and again
was elected. . . . He served as judge, in all, twenty years,
one month and a half.''

At the outset it is observed that there is no evidence
of this nature in the record. Whether by such statements
counsel calculated that the jury should conclude from a
political and popular view of the situation that an acquittal
would not be tolerated, or that one of their eminent leaders
had decided that the defendants were guilty, he did not say.
It remains that such argument was unjustifiable upon any
ground. The jurors must of necessity have respected and

valued the opinion of a learned and distinguished jurist, and doubtless so no less because he was not then on the bench. Considering the entire record, the assertion, in effect, that he believed the defendants to be guilty of the heinous crime charged against them may well have constituted a determining factor in convincing these jurors of their guilt. Since Judge Short was not of counsel for the prosecution, it was impossible for the defendants by examination of the jurors to determine as to whether or not he may have then represented some or all of them, or whether his views would tend to influence them one way or the other. The argument was therefore in this respect improper, and we cannot say that it was not prejudicial.

[8] Again, counsel said: "There must have been something in that testimony that did not convey innocence to that coroner's jury, for the reason that they didn't absolutely give them a clean bill of health. . . . We know that these particular people on that ranch at that time are guilty of murder. We know that they struck this man."

There is no evidence in the record upon which such statements could legitimately be founded. For aught that appears the coroner's jury may have believed that Lee Camp's death was the result of an accident. In any event, they were not required to find the defendants not guilty as a condition precedent to any action of a future petit jury. Counsel produced no eye-witness to the occurrence, and was not authorized to comment upon the verdict of the coroner's jury, nor to predicate a statement of the ultimate fact upon his private opinion. (*People* v. *Edgar,* 34 Cal. App. 459, 567 [167 Pac. 891].)

[9] Counsel's argument bristled with prejudicial insinuations, or worse, concerning the failure of the defendants to testify. He said, in part:

"At certain times and places the defendants have made certain statements which had been introduced here. At other times they have remained silent. Now then, they have brought in before you Stant Brown, knowing that he was known personally to a number of you, . . . and he, the poor invalid that has been lying up there, and the least apt to know about the facts of the case; . . . he did not know half as much about the case as other people did. . . . If your wife was accused, wouldn't you feel that you were

not the proper party, that you weren't the best evidence; and so I say to you, gentlemen, that by the weakness of their efforts to deny certain accusations they have loaned an undying strength to our charge. . . . The only possible contradiction that you have to it is an argument of *counsel paid by these defendants, to do with an argument what they were scared to do with evidence.* And I want to say to you that any time I call you a liar and I tell you wherein you are a liar, *instead of you denying it, you get somebody else to argue for you,* the logical deduction is that there is something wrong.'' And referring to Mrs. Brown's answer to one question before the coroner's jury: ''That is the only sentence, if you please, that she ever gave; the only instance she ever gave was the testimony to the coroner.'' And, finally: ''You have the witnesses to this crime, and you know the way your criminal affairs have been handled in the past, and it is time that somebody was brought in that they do dislike, that does things they dislike, because if they didn't you had better go home tonight and build a wall around your house, and prepare to take the law in your own hands, and give yourselves and your family your own protection.''

That the defendants may have elected to stand mute was not a subject for argument to the jury, nor one which they could under any consideration be permitted to consider. As to whether the jurors might or might not under given circumstances deem themselves proper witnesses was a question wholly foreign to a determination of the issues before them. We are unable to conceive of any view which the jury could have taken of the argument last quoted other than that it was intended to suggest that had the defendants dared to do so they would have testified. Such is often not the reason for one declining to take the stand when charged with a public offense, and every person's inviolable right to remain silent, for any reason whatever, or for no reason, without subjecting himself to comment of counsel or consideration of that fact by the jury, ever has been and is to-day safeguarded by the courts of last resort in all jurisdictions. (Pen. Code, sec. 1323; *People* v. *Morris,* 3 Cal. App. 1, 6 [84 Pac. 463]; *People* v. *Tyler,* 35 Cal. 522, 528; *People* v. *Keko,* 27 Cal. App. 351, 352 [149 Pac. 1003]; *People* v. *Lemperle,* 94 Cal. 45, 48 [29 Pac. 709]; *People* v. *Edgar, supra.)*

It was also prejudicial misconduct for counsel to suggest that the jurors take the law into their own hands. (*Hemphill* v. *Texas,* 72 Tex. Cr. 638 [51 L. R. A. (N. S.) 914, 165 S. W. 462]; *State* v. *Hess,* 240 Mo. 147 [144 S. W. 489]; *Ferguson* v. *State,* 49 Ind. 33; *Parker* v. *State,* 43 Tex. Cr. App. 526 [67 S. W. 121]; *Turner* v. *State,* 4 Lea (Tenn.), 206.)

[10] The argument of this special prosecutor consisted of an extended inflammatory attack upon the defendants and their counsel, and it appears that his discourse was followed by "applause and cheers from the audience." The record is permeated by significant exhibitions of appeal, invective and demands for conviction which could have and doubtless did arouse the passion and prejudice of the jury no less than that of the others listening. It is impossible to say that it appears of record, or could have been characterized by the jury, as a plea for a fair and impartial verdict. We are unable to ignore the fact that if the ingeniously sweeping statements and accusations of counsel without proof, his charge that the defendants dared not produce better evidence, and that but for his presence the jury might as well resort to unlawful individual action—if these combined lacked damaging influence and coercion, the deficiency was supplied by "applause and cheers," reinforced by the weight of the rulings of the trial court thereon.

Exceptions were taken to certain of such remarks, whereupon it was stipulated, and the court ordered, that to avoid repeated interruption, any desired assignments for misconduct should not be deemed to have been waived, and might be stated at the close of the argument. When counsel for the People had concluded, the defendants accordingly excepted to the "applause and cheers," and moved that the courtroom be cleared, which motion was denied. Assignments of the alleged prejudicial statements of counsel as misconduct were then attempted to be made, when the trial court interrupted, saying: "Mr. Covert, that will be deemed. The court will deem that you have excepted to every statement, and that you have assigned every statement as misconduct on the part of the district attorney, and that the court—and that you have requested the court to instruct the jury—and that the court has refused to do so." The col-

loquy closed as follows: "Mr. Covert: That is entirely satisfactory. The Court: All right, and that is all for the defendants."

While it could not be said that counsel's entire argument was improper, and constituted misconduct, the defendants were not allowed to designate and except to the portions which were obviously prejudicial, and the entire harangue remained with the jury, unqualified, and stamped with the approval of the trial court.

We do not think any admonition by the court below could have disabused the minds of the jury of the damaging thrusts of the prosecutor which so patently savored of animosity and personal venom. But it lay within the power and the duty of the court to caution the jury, and to admonish counsel, when objection was first interposed, and to prevent a repetition of such infractions of the most elementary rules of judicial procedure and decorum. The action of counsel for the prosecution was beyond doubt damaging misconduct, and the rulings of the trial court constituted prejudicial error.

[11] On February 19, 1924, the grand jury which returned the indictment in this case were in session at the courthouse, and appellant Tipton, who had been sworn, testified before them. At the close of the day the foreman announced an adjournment until the following morning and instructed Tipton to return at 10 o'clock A. M. On the morning of the 20th the inquisitorial body met at the courthouse, but did not enter their jury-room. It appears that they entered automobiles and proceeded to the premises of appellants, and that Tipton and other witnesses were present, and took part in demonstrating and explaining to the grand jurors the position in which Camp had been found, the locations of bloodspots, and other paraphernalia.

Prior to the trial motions were made to set aside the indictment upon the ground that "a third person was present during the session of the grand jury, when the charge embraced in the indictment was under consideration, other than the persons provided by section 925 of the Penal Code."

The respondent denied that the grand jury "convened" at said premises, or that they held a "session" at that time. It is here insisted that the grand jury drove to the ranch in their respective automobiles; that they divided into groups, inspected the premises, and individually gathered

a "general aspect" of surrounding conditions for the pur-
pose of acquiring a "mental picture" of the situation. The
foreman of the grand jury and appellant Tipton testified,
and affidavits of others, including five of the grand jurors,
were introduced upon the motion to set aside the indictment.

From such evidence it appears that the grand jurors all
assembled at the tankhouse in question, and that one Fields,
a detective for an insurance company, was placed on the
ground in approximately the position in which Camp lay
when found; that appellants Tipton and Mills took part
in the demonstration, and that witnesses Cronin and Hal-
linan, and two Chinamen were present. Tipton swore that
he was questioned by certain grand jurors and others; that
he was directed to obtain the rope, and the block and tackle,
and to "come around there at that particular tankhouse
where this demonstration was going on; . . . Mr. Fields was
the man doing the demonstrating. . . . He was lying on the
ground and I was to place his body in the position, as near
as I could remember, as that which Mr. Camp's body was
found at the time I found him . . . , and I placed, as
near as I could, his carcass, as near as I could remember as
to where it should be. . . . Fields argued with me about
objects supposed to have been present when Camp was killed;
asked me who moved the rope from the tankhouse; I asked
him if he was a member of the grand jury, and he said no;
I told him, 'It looks to me as if you have got far enough';
he then hauled off as though he was going to take a punch
at me." The foregoing testimony was corroborated by Hal-
linan, Mills, and Cronin. The latter averred that Fields
actively participated in the examination of witnesses, demon-
strated his theory as to how the murder was committed,
argued with members of the jury, and disposed his body
and other objects upon the ground, and that Tipton was
examined for a period of about fifteen minutes. Mills swore
that he also was examined to considerable length, and that he
was required by the grand jurors to assist in the demonstra-
tion; that some jurymen asked about the bloodspots, and
"Then I showed them as near as I could the blood spots,
where they were, and showed them under the bench that is
there, where the blood spots were on the house about five
or six feet away, and are still there." This witness also

testified that he had previously been sworn by the grand jury.

The evidence adduced upon the hearing of the motion to set aside the indictment is voluminous, but we deem it unnecessary for the purpose of considering the point here presented to quote it extensively. None of the grand jurors deny the fact that witnesses were questioned, or that the jurors were all present; the demonstrations are admitted to have been made as we have recited. Some of the statements of appellants' witnesses are evaded by the foreman and other grand jurors, but none denied. It was testified by them that they were not acquainted with Hallinan or Cronin, and, therefore, that they could not say whether they saw them or not. The crux of the situation, however, arises by strenuous insistence of the grand jurors, statements of the trial court, and argument in the briefs upon appeal, that the jurors did not convene as a grand jury, nor swear any witnesses at the ranch; that they visited the premises merely for the purpose of inspection, and were not "in session" when the evidence mentioned was offered.

The Penal Code requires that a grand jury must retire to a private room to inquire into alleged offenses (Pen. Code, sec. 906); that they can receive no other evidence than such as is given by witnesses produced and sworn before them, or furnished by legal documentary evidence, or by deposition (Pen. Code, sec. 919); and that no person other than counsel for the People, a stenographic reporter, witness, and interpreter, shall be present *during the session* of the grand jury, and no person must be permitted to be present during the expression of their opinions, or giving their votes upon any matter before them. (Pen. Code, sec. 925.)

Our attention is called to no authority in this or any other jurisdiction which by even remote analogy can be said to have sanctioned proceedings of a grand jury such as are outlined in the record before us. In *State* v. *Johnson,* 116 La. 856 [41 South. 117], it was held that to merely visit the scene of a homicide in charge of a deputy sheriff and the district attorney, without an order of court therefor, was not improper. But such ruling was expressly founded upon statutes requiring grand jurors to act upon facts within their own knowledge, and "from which it also follows that they do not require the permission of the court to investigate

crime, but are bound to take the initiative and determine for themselves the character of the evidence, or the sufficiency of the facts, necessary to their findings." In *Wyatt* v. *People,* 17 Colo. 252 [28 Pac. 961], the supreme court of Colorado held that while cases might arise wherein such *inspection* would greatly assist them, "Such proceedings being unusual and extraordinary, must, unless otherwise provided by statute, first have the sanction of the court; and, as a matter of course, there must be a careful compliance with the limitations and regulations prescribed in the order." It must at once be conceded that the grand jury of whose proceedings complaint is made in the instant case acted not only without an order of court, but in contravention of the provisions of the Penal Code. The statutes of this state do not vest in grand juries the broad powers of investigation and discretion indicated by the Louisiana case above cited. The Penal Code is mandatory in its safeguards of such secret inquisitorial bodies. And, further, it cannot be said that the grand jury here involved visited the premises in question in charge of a deputy sheriff and district attorney, or merely for the purpose of inspection. The mere fact that apparently as an afterthought they now seek to escape criticism by asserting that they were not "in session" at the Brown ranch, and that they swore no witnesses, cannot alter the record, nor is the legal effect of their conduct within their province to decide. They adjourned on the 19th of February, to meet at 10 o'clock A. M. on the 20th; they did not enter their jury-room as formerly intended and agreed, but all proceeded to the premises of their own volition, where they received much evidence; at least seven other persons were present during the proceedings, two of whom were witnesses who had theretofore been sworn, and had testified before the grand jury. To permit such bodies, surrounded as they are by the statutory restrictions which we have indicated, to arbitrarily rule themselves "in session" and not "in session," and to receive evidence in the same case in both capacities, would be to hold that the provisions of the statute are directory only, and that by some power peculiar to themselves they might at will deprive courts of the power to afford the public any of the benefits provided by the legislature.

As was said in *People* v. *Bright,* 157 Cal. 663, 666 [109 Pac. 33], the only capacity in which an unauthorized person may be called before or attend upon the grand jury session is that "of witness during the actual taking of his own testimony." And the supreme court concluded by announcing the rule as follows: "We may question the wisdom of some of our statutory provisions relative to grand jurors and the grounds upon which an·indictment shall be set aside, but it is our duty to comply with their mandatory requirements. . . . " The consensus of all authority with which we are familiar is in complete harmony with this rule. In *State* v. *Wetzel,* 75 W. Va. 7 [Ann. Cas. 1918A, 1074, 83 S. E. 68], it appeared that a grand jury adjourned to other premises, where four persons not witnesses discussed certain facts, whereupon they returned to their jury-room. It was there said: "The law holds inviolate the secrecy of proceedings before the grand jury. . . . Quoting from the opinion of Judge Bynum, in *Lewis* v. *Board of Commrs.,* 74 N. C. 199: 'None but witnesses have any business before them. . . . The examination of witnesses is conducted by them, without the advice or interference of others. Their findings must be their own, uninfluenced by the promptings or suggestions of others, or their opportunity therefor.' " Many other authorities are quoted with approval in *State* v. *Wetzel, supra,* wherein all informal appearances before grand juries, and unauthorized participation in their inquiries, are condemned. In *State* v. *Fasset,* 16 Conn. 457, it was said: "It is the peculiar policy of the law, in the furtherance of justice, that this preliminary inquiry should be conducted in secret."

The trial court in its ruling sustaining the indictment herein stated, in part: "They certainly did get information there, there is no question about that. But that is equally true of trial juries. If you want to take the analogy of trial juries going out to view premises. They certainly get information there. That is their object in going out there." This point was discussed in *Wyatt* v. *People, supra,* in the following language: "Some analogy may be said to exist in this regard between the action of grand and petit juries, though the larger powers and greater independence of the former render this analogy imperfect. Inspection by the latter during the progress of trials, under proper circumstances

and limitations, is now frequently permitted in civil cases, and the authority therefor is often declared by statute. But we are strongly of the opinion that the grand jury has no more right to visit premises for the purpose of official inspection upon its own motion than the petit jury.'' It would not for an instant be contended that even a petit jury could voluntarily and without an order of court make an inspection of premises and examine witnesses in a case before it, and under the authority last cited there is much less justification for such action by a grand jury. We think, therefore, that the order denying the motion to set aside the indictment should have been granted.

Many other points are presented, but they involve questions which either because of what has been said become unimportant or may not be expected to again arise in the event of another trial.

The judgments and orders appealed from are reversed, with directions to the trial court to set aside the indictment.

Works, P. J., and Thompson, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 8, 1927, and the following opinion then rendered thereon:

THE COURT.—The petition for rehearing is denied. [12] In denying the same, however, we withhold our approval from that portion of the decision of the district court of appeal wherein it was held that the trial court was in error in admitting certain evidence offered by the prosecution to impeach the witness Garcia. In our opinion such evidence was properly admitted and the appellate court was in error in holding to the contrary. In all other respects, however, we are in accord with the decision of the district court of appeal.