[Crim. No. 7877. In Bank. Feb. 11, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. LAWRENCE GLENN MODESTO, Defendant and Appellant.

Richard Gladstein, under appointment by the Supreme Court, and Norman Leonard for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, Norman H. Sokolow, Deputy Attorney General, William O. Mackey, District Attorney (Riverside), and Roland Wilson, Deputy District Attorney, for Plaintiff and Respondent.

TRAYNOR, C. J.—This appeal is automatic from a judgment imposing the death penalty. (Pen. Code, § 1239, subd. (b).)

In a previous trial defendant had been found guilty of the first degree murders of Connie Mack and Mary Mack, and sentenced to death. The judgment was reversed on the ground that the trial court erred in refusing to instruct the jury on the issue of manslaughter. (*People* v. *Modesto,* 59 Cal.2d 722, 727-731 [31 Cal.Rptr. 225, 382 P.2d 33].) Before retrial defendant reinstated his pleas of not guilty by reason of insanity, which he had withdrawn during the first trial. Upon retrial the jury found defendant guilty of two counts of first degree murder, determined that he was sane at the time each crime was committed, and fixed the penalty on each count at death.

At the retrial on the issue of guilt the prosecution introduced substantially the same evidence it introduced at the former trial. The basic facts were summarized in our former opinion as follows.

"Shortly after midnight on October 29, 1961, defendant entered the home of Mr. and Mrs. Ardel Mack carrying a hand sledge hammer with a 4-pound head. The Macks' daughters, Connie, age 12, and Mary, age 9, were asleep in the house. At about 10:30 p.m. the previous evening defendant had seen Mr. and Mrs. Mack at a place where Mr. Mack played the guitar with a band and knew that they would not return home until about 2 a.m. Upon returning home the Macks found Mary lying on the floor dead. Connie had disappeared. Her blankets were on the floor, and there was blood on her bed.

"Defendant was arrested at his home at about 2:30 a.m., October 29, 1961. The arresting officers found bloodstains on the right rear fender, the right rear door handle, the rear seat, and the floor mat of defendant's automobile. The blood on the rear seat appeared to have been smeared by a body moving on the seat. Defendant's sledge hammer was removed

from the trunk of his automobile. A chemist testified that the hammer had been heavily smeared with blood and had been washed.

"At the time of his arrest, defendant was asleep in his bed, wearing only a pair of shorts. His hands were blood-stained, as were his shorts and his other clothes found on the floor of his room. A police chemist testified that there were semen stains on defendant's T-shirt, on the outside of his trousers, and on the shorts he was wearing when arrested.

"At 7 p.m. on the day of his arrest, defendant admitted to police investigators that he struck Mary and Connie with the sledge hammer. He stated that he entered the Mack home 'with the intentions of scaring Connie Jean for the way she has been acting, snotty and smart-aleckie, and just to kind of get back at her for a lot of things she said. I went into the house through the side door. The house was dark and the door wasn't locked. So I went to the bedroom, flicked on the light and Connie Jean turned over and mumbled something and I shut the light off again, and I went over to shake her awake, and little Mary turned on the light, and I turned around with the intention of scaring her, and my hand went too far and I hit her with the sledge hammer. She went down, moaning, and Connie Jean started screaming, so I told her to be quiet, and I went like this (indicating) to hit her too, but my hammer just went right on and I hit her too; and I don't know, after that I don't know how many times I hit them—three or four or five times apiece—I don't know. They were moaning and screaming and I couldn't remember how many times I hit them.'

"Defendant stated to the officers that he then picked up Connie and dropped her on the lawn, returning to the house for the hammer. After putting Connie's unconscious body on the rear floor of the car, defendant stated that he intended to go back for Mary, but panicked and drove away when he saw the lights of approaching automobiles. Shortly thereafter he stopped at a drainage ditch to clean the blood from Connie's head. 'When I opened the door her legs hung out. And the next thing I knew she was on the ground—so I grabbed her by the hand and pulled her over to the side of that drainage ditch . . . so I could get some water to clean her off, and she just tumbled into the water, moaning loudly. . . .'

"Defendant also stated to the officers that 'Between there [the drainage ditch] and . . . the house . . . I don't know

where I stopped. I'm not sure in my mind, but I think—I think I had intercourse with Connie—I'm not sure.'

"Connie's body was found face down in the drainage ditch downstream from the point at which defendant stated she had gone into the water.

"Autopsies of the girls' bodies showed four separate injuries to Connie's head and five separate injuries to Mary's head, which were probably inflicted by the sledge hammer. Although drowning was the immediate cause of Connie's death, the injuries to her head would have been fatal. Mary's death resulted from injuries to the brain caused by multiple skull fractures. Since Connie had been carried downstream in rapidly moving water and had been in the water nine to ten hours, the pathologist was unable to state whether or not she had been sexually molested.'' (*People* v. *Modesto,* 59 Cal.2d 722, 725-727 [31 Cal.Rptr. 225, 382 P.2d 33].)

It is not disputed that defendant killed the two girls. The prosecution sought to prove that the killings were murders of the first degree on the ground that they were either wilful, deliberate, and premeditated, or occurred during the commission of burglary, rape, or an act punishable under Penal Code section 288. (Pen. Code, § 189.) Defendant did not testify. He relied on evidence of intoxication and brain damage to support the opinion of expert witnesses that he did not form a deliberate and premeditated intent to kill or an intent to commit any of the enumerated felonies. Although he presented more extensive evidence of this defense at the retrial than at the former trial, we are not persuaded to depart from our holding on the former appeal that the evidence is sufficient to support the verdicts. (59 Cal.2d at p. 727.)

Defendant contends that the trial court erred in denying his motion for a change of venue on the ground that he could not obtain a fair and impartial trial in Riverside County. (Pen. Code, § 1033.) He supported his motion with affidavits setting forth the extensive newspaper coverage of his first trial and this court's reversal of the judgment. He asserts that the prospective jurors must have been aware of his criminal record, including the fact that he was on parole from a judgment of conviction of second degree murder at the time of the present homicides; that he had confessed; and that the trial judge at the first trial had stated his agreement with the verdicts and later vigorously criticized the decision of this court reversing the judgment.

The newspaper articles attached to defendant's affidavit

were published from October 31, 1961, to July 17, 1963. The case was retried before a different trial judge, who denied defendant's motion to change venue without prejudice on September 10, 1963. The trial was commenced on October 14, 1963, and no difficulty was experienced in securing jurors who were not aware of the earlier publicity. Defendant did not exhaust his peremptory challenges, and he did not renew his motion to change venue. Under these circumstances the trial court did not abuse its discretion in denying defendant's motion without prejudice before trial and did not err in failing to raise the question on its own motion thereafter. It could reasonably conclude that defendant could secure a fair trial in Riverside County. (See *People* v. *Duncan,* 53 Cal.2d 803, 812 [350 P.2d 103] ; cf. *Irvin* v. *Dowd,* 366 U.S. 717, 720, 726-727 [81 S.Ct. 1639, 6 L.Ed.2d 751] ; *People* v. *McKay,* 37 Cal.2d 792, 800 [236 P.2d 145].)

Defendant contends that the trial court erred in admitting into evidence photographs and color slides of the victims. We adhere to our holding on the former appeal that the trial court did not abuse its discretion in determining that the probative value of this evidence outweighed any probable prejudicial effect. (*People* v. *Modesto,* 59 Cal.2d 722, 733-734 [31 Cal.Rptr. 225, 382 P.2d 33].)

At the trial on the issue of sanity, defendant relied on the testimony of two psychiatrists that he was undergoing a psycho-motor epileptic seizure at the time he committed the homicides and was therefore legally insane. The prosecution relied on the testimony of four other psychiatrists to the effect that defendant was legally sane. In view of this conflict, there is no merit in defendant's contention that the evidence does not support the verdicts finding him sane.

At the trial on the issue of guilt several statements made by defendant to the police were introduced into evidence over objection after the prosecution laid a foundation that each statement was freely and voluntarily made. Defendant contends that at least the last and most damaging of these statements was inadmissible under the decisions of the United States Supreme Court in *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], and *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. We shall consider the admissibility of all of them in the light of those decisions.

Officer Mabbitt questioned defendant at about 6 in the morning following the homicides. At that time Connie's

body had not been found. Defendant stated that he met Connie's father about 10 a.m. the day before and that he and Connie's father bought beer and drove around while drinking it. About 3:30 in the afternoon they picked up Connie and took her home. She refused to ride in the front seat between defendant and her father until her father told her to do so. After taking Connie home, the two men bought and drank more beer and then took someone from the Modesto residence to a christening.

About 7:30 a.m. Officer Mabbitt was joined by Mr. Boller, an investigator from the district attorney's office, and the two had a second conversation with defendant. He repeated to Mr. Boller what he had told Officer Mabbitt and at first denied having seen Connie after he took her home the afternoon before. Either Officer Mabbitt or Mr. Boller suggested to defendant that Connie might still be alive and that if he could help them to locate her, they might be able to save her life. Defendant studied a few minutes and then said ''water,'' studied a few more minutes and said, ''Avenue 62 and the storm drain.'' He then told the officers that Connie fell in the water and that he would show them where it happened.

The officers took defendant to the storm drain, and he showed them where Connie fell into it. While the officers and defendant were at the storm drain, Mr. Marsh, an attorney acting apparently at the request of defendant's family, arrived to represent him. Mr. Marsh conferred privately with defendant in the police car and then joined in the search. Shortly thereafter the officers learned that Connie's body had been found some distance away, and they returned with defendant to the police station.

About 1:20 in the afternoon Officer Mabbitt interrogated defendant again. Mr. Boller and a court reporter were also present, and the interview was taken down and transcribed. Defendant repeated the same story he had told before about being with Mr. Mack, drinking beer, picking up Connie and taking her home, and going to the christening. He also stated that later in the evening he went to a cafe where Mr. Mack worked and to another cafe. He met his mother and father and they all drank beer. His father drove him home because he was too drunk to drive. The next thing he remembered was seeing Connie on the floor of the back seat of his car with blood over her. He took her to the storm drain to wash the blood off, and she slipped into the water. He looked for her along the bank, and although he could not see her, he could hear her moaning and thought she had caught on some roots

or something. He then drove home, and the next thing he knew the officers awakened him. He stated that he must have hit Connie but did not remember. He did not remember using any weapon or going to the Mack home that night. He was asked whether he had any difficulty with Connie in the past and stated that she treated him as if he was dirt. During the interview, after answering a question about his wife's car, he volunteered that "I have given that statement, and Mr. Marsh [the attorney] has told me that he didn't care, just to repeat what I'd said here. He said 'You can talk to them if you want to, and if you don't, well then——'.''

About 3:30 in the afternoon, Undersheriff Presley took over the questioning of defendant. He told defendant several times that he did not believe that defendant did not remember further details of the crimes. He testified that "There was considerable discussion back and forth on these points and finally he said that he would like to tell his attorney first. . . . Q. What did you say to that? A. Well, I tried to impress him at this time the importance of telling us at this particular time, rather than to wait and tell the attorney later. . . . I pointed out to Mr. Modesto in the light of this statement regarding the attorney, the fact he could tell his attorney what had happened, I felt he did remember and he was also capable of telling us at this time.''

The officers then took defendant to dinner and made an unsuccessful attempt to reach Mr. Marsh. After dinner Undersheriff Presley took defendant back to the office where he had been interviewing him and attempted without success to call Mr. Marsh on the telephone. He then gave the telephone to defendant, who dialed Mr. Marsh's number but was also unable to reach him. Defendant then started to tell the officers what had occurred. He made the statements set forth above in which he described the details of the commission of the crime including the fact that he thought he had had intercourse with Connie.

In *Escobedo* v. *Illinois,* 378 U.S. 478, 490-491 [84 S.Ct. 1758, 12 L.Ed.2d 977], the United States Supreme Court held that "where . . . [a criminal] investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively

warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright,* 372 U.S., at 342 [372 U.S. 335 (83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733)], and that no statement elicited by the police during the interrogation may be used against him at a criminal trial.''

With respect to defendant's last and most complete and damaging statements, all of the conditions of the *Escobedo* holding were met. It is immaterial that defendant was allowed to consult with his attorney several hours earlier and was advised that he could talk to the police if he wished and repeat the substantially less damaging admissions he had already made at that time. Escobedo had also discussed with his attorney what he should do in case of interrogation, but in this case as in the *Escobedo* case, there is no evidence that defendant was advised as to what he should or could do in the face of the continuing interrogation that took place. (*Escobedo* v. *Illinois,* 378 U.S. 478, 485, fn. 5 [84 S.Ct. 1758, 12 L.Ed.2d 977].) Accordingly, the judgment must be reversed.

The admissibility of defendant's other statements will arise on retrial. ■ The statements made by defendant before Connie's body was discovered are admissible. They were freely and voluntarily made at a time when the officers were concerned primarily with the possibility of saving Connie's life. The paramount interest in saving her life, if possible, clearly justified the officers in not impeding their rescue efforts by informing defendant of his rights to remain silent and to the assistance of counsel. Since these statements were voluntarily made and lawfully obtained, there is no basis for their exclusion. (See *People* v. *Roberts,* 47 Cal.2d 374, 379 [303 P.2d 721].) It is true that in *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], the United States Supreme Court held that incriminating statements surreptitiously obtained from an indicted defendant who had been released on bail could not be used against him at his trial even though the court assumed the statements were lawfully obtained in the course of a continuing police investigation of crime. In the *Massiah* case, however, no compelling emergency was present, and the continuing investigation of other crimes could reasonably be segregated from the proof of the crime for which the defendant had been indicted. In the present case the officers' investigatory and rescue

operations were necessarily inextricably interwoven until Connie's body was found, and it would be needlessly restrictive to exclude any evidence lawfully obtained during the rescue operations. Under these circumstances we do not believe that the *Massiah* case is controlling.

 The statements made between the time Connie's body was found and the time defendant sought to consult again with his attorney present still a different problem. Under our holding in *People* v. *Dorado, ante,* p. 338 [42 Cal. Rptr. 169, 398 P.2d 361], these statements are inadmissible unless as to them defendant waived his right to counsel and his right to remain silent. In view of his reference to his attorney's advice with respect to making these statements, it is possible that defendant waived his rights as to them. That reference was ambiguous at best, however, and unless the prosecution can present additional evidence of waiver on retrial, these statements should be excluded.

 Both the trial court and the prosecutor, as the California comment rule[1] allows, commented on the failure of the defendant to take the stand. Defendant contends that these comments infringed his privilege against self-incrimination,[2] now guaranteed by the Fourteenth Amendment to state criminal defendants (*Malloy* v. *Hogan,* 378 U.S. 1, 3 [84 S.Ct. 1489, 12 L.Ed.2d 653]), by permitting unfavorable references from his refusal to testify. We reject this contention. We hold that the use of the comment in defendant's trial was constitutionally permissible.

There is no authoritative holding whether state comment rules violate the privilege against self-incrimination. The United States Supreme Court has heard two cases challenging state comment rules, but refused to decide the issue in both of them. (*Malloy* v. *Hogan,* 378 U.S. 1, 2-3, fn. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653].) In the first case, *Twining* v. *New Jersey,* 211 U.S. 78, 90-91 [29 S.Ct. 14, 53 L.Ed. 97], the court assumed that the comment infringed the federal privilege against self-incrimination but held that the Fourteenth Amendment did not require the states to grant that privilege.

---

[1] "No person shall . . . be compelled, in any criminal case, to be a witness against himself . . . but in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury." (Cal. Const., art. I, § 13; see Pen. Code, § 1323.)

[2] "No person . . . shall be compelled in any criminal case to be a witness against himself, . . ." (U.S. Const., Amend. V.)

The court emphasized that "We have assumed only for the purpose of discussion that what was done in the case at bar was an infringement of the privilege against self-incrimination. We do not intend, however, to lend any countenance to the truth of that assumption." (211 U.S. 78, 114.) In *Adamson* v. *California,* 332 U.S. 46, 50 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223], the court again assumed that the comment would violate the privilege "without any intention thereby of ruling upon the issue," and followed its holding in *Twining* that the Fifth Amendment was not binding upon the states.[3] The state courts have divided on the question whether the comment rule violates state constitutional protections of the privilege against self-incrimination. (Compare *In re Opinion of the Justices,* 300 Mass. 620, 625 [15 N.E.2d 662] (1 dissent); *State* v. *Wolfe,* 64 S.D. 178, 184-188 [266 N.W. 116, 104 A.L.R. 464] (2 dissents) (holding the comment unconstitutional) with *State* v. *Baker,* 115 Vt. 94, 98-111 [53 A.2d 53] (2 dissents); *State* v. *Sandoval,* 59 N.M. 85, 88-90 [279 P.2d 850] (finding the comment constitutional).)[4]

▮ The rule against comment in the federal courts does not necessitate our holding the California comment rule unconstitutional. The federal rule is founded not on constitutional command but on statutory interpretation. The congressional provision that a defendant's failure to request to be a witness in the case "shall not create any presumption against him" (18 U.S.C. § 3481) has been interpreted to exclude any comment. (*Wilson* v. *United States,* 149 U.S. 60, 65 [13 S.Ct. 765, 37 L.Ed. 650]; *Bruno* v. *United States,* 308 U.S. 287, 292-293 [60 S.Ct. 198, 84 L.Ed. 257]; *Adamson* v. *California,* 332 U.S. 46, 50, fn. 6 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223].) ▮ Although it is the federal privilege that is now protected by the Fourteenth Amendment (*Malloy* v. *Hogan,* 378 U.S. 1, 10 [84 S.Ct. 1489, 12 L.Ed.2d 653]), the state must follow only the constitutional and not

---

[3]Mr. Justice Black, in dissent, felt that the court's opinion "strongly implies that the Fifth Amendment does not, of itself, bar comment upon failure to testify in federal courts. . . ." (332 U.S. 46, 69.)

[4]In 1869, in *People* v. *Tyler,* 36 Cal. 522, 530, before the California Constitution was amended to permit comment, this court held that the comment made in that case violated the state privilege against self-incrimination. The district attorney had argued that silence was a circumstance "tending strongly to prove [defendant's] guilt." (*People* v. *Tyler,* 36 Cal. 522, 527.) The amendment to the California Constitution allows a much more limited comment. (*People* v. *Adamson,* 27 Cal.2d 478, 489-490 [165 P.2d 3].)

the statutory aspects of the privilege. (*Ker* v. *California,* 374 U.S. 23, 31-34 [83 S.Ct. 1623, 10 L.Ed.2d 726].) Defendant contends that the statement in *Johnson* v. *United States,* 318 U.S. 189, 196 [63 S.Ct. 549, 87 L.Ed. 704], that " 'no inferences whatever can be legitimately drawn' " from invoking the privilege, establishes that no comment can constitutionally be made on the accused's failure to testify in the federal courts. In that case, however, the trial court had assured the defendant that he could refuse to answer certain questions while on the stand, and yet allowed adverse comment on that refusal. The Supreme Court condemned this misleading of the defendant on the consequences of his assertion of the privilege against self-incrimination. Indeed in *Adamson* the court distinguished *Johnson* on this ground. It stated that under the California rule "The choice between giving evidence and remaining silent was an open choice. There was no such possible misleading of the defendant as we condemned in *Johnson* v. *United States,* 318 U.S. 189, 195-199 [63 S.Ct. 549, 87 L.Ed. 704]." (*Adamson* v. *California,* 332 U.S. 46, 58, fn. 17 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223].) Thus, by expressly refraining from deciding whether comment would be permissible under the Fifth Amendment and by distinguishing *Johnson* on the ground that the accused had been misled, the court in *Adamson* made clear that the broad language in *Johnson* was dictum. Moreover, defendant's refusal to testify can sometimes be used against him in a federal trial. Thus, once the defendant has taken the stand, the federal rule allows comment on his failure to testify on all aspects of the case. (*Caminetti* v. *United States,* 242 U.S. 470, 492-495 [37 S.Ct. 192, 61 L.Ed. 442].) Furthermore, defendant's assertion of the privilege in an earlier trial can be used to impeach specific testimony when he takes the stand in a later trial (*Raffel* v. *United States,* 271 U.S. 494, 497-499 [46 S.Ct. 566, 70 L.Ed. 1054]), unless the silence is not inconsistent with his testimony and is used only to impeach his general credibility. (*Grunewald* v. *United States,* 353 U.S. 391, 418-424 [77 S.Ct. 963, 1 L.Ed.2d 931, 62 A.L.R.2d 1344]; see *Stewart* v. *United States,* 366 U.S. 1, 6 [81 S.Ct. 941, 6 L.Ed.2d 84].)

In determining the constitutionality of the California comment rule, the narrow scope of the permission to comment is crucial.[5] ▪ The comment rule does not relieve the prose-

---

[5] Allowing some types of comment might be a denial of due process. "For example, a statute might declare that a permitted refusal to

450

cution of its burden of proving every essential element of the crime and the defendant's guilt beyond a reasonable doubt. No presumption of guilt or of the truth of any fact arises. No inference can be drawn if defendant does not have the knowledge necessary to explain or deny the evidence against him. (*People* v. *Adamson,* 27 Cal.2d 478, 489-490 [165 P.2d 3]; *Adamson* v. *California,* 332 U.S. 46, 55-56 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223].) ▮ The comment serves merely to advise the jury how to treat the evidence the prosecution has introduced. (*People* v. *Ashley,* 42 Cal.2d 246, 268-269 [267 P.2d 271], cert. den. 348 U.S. 900 [75 S.Ct. 222, 99 L.Ed. 707].) "[I]f it appears from the evidence that defendant could reasonably be expected to explain or deny evidence presented against him, the jury may consider his failure to do so as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable." (*People* v. *Adamson,* 27 Cal.2d 478, 490-491 [165 P.2d 3].)

▮ Such carefully circumscribed comment does not conflict with the policies of the federal privilege against self-incrimination. The United States Supreme Court restated those policies in *Murphy* v. *Waterfront Com.,* 378 U.S. 52, 55 [84 S.Ct. 1594, 12 L.Ed.2d 678], on the same day it held the Fifth Amendment binding on the states. It stated that the privilege was based on "our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incrimination statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,' . . . ; our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life,' . . . ; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty' is often a 'protection to the innocent.' " ▮ The California com-

testify would compel an acceptance of the truth of the prosecution's evidence." (*Adamson* v. *California,* 332 U.S. 46, 55 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223].)

ment rule does not subject the defendant to the trilemma of self-accusation, perjury, or contempt, for he remains free not to testify. It does not substitute an inquisitorial system for an accusatorial system, for the state must introduce evidence of every element of the defendant's guilt before any inference can be drawn from his silence. (*People* v. *Talle*, 111 Cal. App.2d 650, 664, 676 [245 P.2d 633].) It affords no opportunity for eliciting statements by inhumane treatment or abuses. It does not permit the government to disturb the individual without good cause or deprecate the inviolability of the human personality and the right of each individual " 'to a private enclave where he may lead a private life.' " It does not compel reliance on self-deprecatory statements. Thus it does not significantly impair any protection the privilege affords the innocent.

Defendant contends, however, that *Malloy* v. *Hogan*, 378 U.S. 1, 8 [84 S.Ct. 1489, 12 L.Ed.2d 653], establishes that the comment rule violates the privilege against self-incrimination. In that case, the petitioner refused to answer any questions, relying on his privilege against self-incrimination. The state court found, however, that the privilege was not properly invoked. Petitioner was therefore committed to prison until he was willing to answer the questions. The United States Supreme Court reversed, holding that the Fourteenth Amendment guaranteed petitioner the Fifth Amendment's privilege against self-incrimination and that under the applicable federal standard, petitioner properly asserted the privilege. In discussing the rule that the Fourteenth Amendment forbids the state from coercing a confession, the court stated that "it follows *a fortiori* that it also forbids the States to resort to imprisonment, as here, to compel him to answer questions that might incriminate him. The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty, as held in *Twining*, for such silence." (378 U.S. 1, 8; see *Grunewald* v. *United States*, 353 U.S. 391, 425 [77 S.Ct. 963, 1 L.Ed.2d 931, 62 A.L.R.2d 1344] (dissent); *Adamson* v. *California*, 332 U.S. 46, 124 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223] (dissent).)

Defendant contends that the inference permitted by the comment rule and comment thereon restricts "the unfettered exercise of his own will" and constitutes a "penalty" within

the meaning of the quoted language. In the *Malloy* case, however, the court refrained from expressing any opinion on the constitutionality of the comment rule. We do not believe that the court intended by the quoted language to condemn the comment rule by implication. Since the court was dealing with a case in which the defendant had been held in contempt for invoking the privilege, we believe it was referring to more direct penalties or interferences with the unfettered exercise of the defendant's free will than the drawing of the reasonable inferences that may flow from silence and comment thereon. In this respect it cannot be overemphasized that whether or not the court or prosecutor comments on the defendant's failure to testify, the jury will draw adverse inferences therefrom. It will expect the defendant to present all the evidence he can to escape conviction, and it will naturally infer that his failure to explain or deny evidence against him when the facts are peculiarly within his knowledge arises from his inability to do so. ''Such an inference is natural and irresistible. It will be drawn by honest jurymen, and no instruction will prevent it.''[6] (*Parker* v. *State,* 61 N.J.Law 308, 314 [39 A. 651], affd., 62 N.J.Law 801 [45 A. 1092]; see *Adamson* v. *California,* 332 U.S. 46, 60 [67 S.Ct. 1672, 91 L.Ed 1903, 171 A.L.R. 1223] (concurring opinion); *State* v. *Grebe,* 17 Kan. 458, 459; *State* v. *Cleaves,* 59 Me. 298, 300-301 [8 Am.Rep. 422].) The Constitution is not at war with common sense. (See *Mapp* v. *Ohio,* 367 U.S. 643, 657 [81 S. Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933].) It does not compel the court to instruct the jurors to ignore inferences their reason dictates. The prevailing view is that such an instruction would be futile and confusing.[7] (8 Wigmore on Evidence (McNaughton Rev. 1961) p. 436.) ▮ The defendant, then, is normally faced with the choice of testifying to avoid adverse inferences or of remaining silent and suffering their consequences. The comments do not magnify

---

[6] The comment merely applies here the established rule on failure to produce evidence—''That evidence is to be estimated *not only by its* own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict.'' (Code Civ. Proc., § 2061, subd. 6.)

[7] One state requires such an instruction to be given (Ind.Ann.Stat., § 9-1603 (1956)) and others require that it be given if requested. (*State* v. *Pavelich,* 150 Wash. 411, 420 [273 P. 182]; *State* v. *Walker,* 94 W.Va. 691, 697-698 [120 S.E. 171].) Two states require the jury not to consider the inference in making its decision. (Kan.Gen.Stat., § 62-1420 (1949); *Canales* v. *State,* 152 Tex.Crim.Rep. 198 [211 S.W.2d 950]. See generally 8 Wigmore on Evidence (McNaughton Rev. 1961) pp. 436-437.)

these normal negative consequences to the extent that they become a "penalty" prohibited by the Fourteenth Amendment. Although the comments might encourage some defendants to testify to avoid the inferences that may reasonably be drawn from their failure to do so (*People* v. *Adamson,* 27 Cal.2d 478, 487 [165 P.2d 3]), we are of the opinion that this encouragement does not amount to the compulsion to testify condemned by the Fifth Amendment. The comments merely guide the jury in doing what it would normally do in any case. In some cases, comments might aid the defendant by preventing the jury from giving too much weight to his refusal to take the stand. (See Bruce, *The Right to Comment on the Failure of the Defendant to Testify,* 31 Mich. L.Rev. 226, 231.)

Defendant contends that *People* v. *Tyler,* 36 Cal. 522, 530, and *People* v. *Adamson,* 27 Cal.2d 478, 487 [165 P.2d 3], establish that the California comment rule violates the privilege against self-incrimination as defined in the Fifth Amendment. In the *Tyler* case, however, the court was concerned only with the state privilege against self-incrimination, and in the *Adamson* case it held, following *Twining* v. *New Jersey,* 211 U.S. 78 [29 S.Ct. 14, 53 L.Ed. 97], that the federal privilege was not binding on the states. Accordingly, any statements or implications in those opinions on the scope of the federal privilege were necessarily dicta. Whatever the court may have believed at the times it decided those cases, we are now for the first time required to face the federal constitutional issue. We are bound by the California Constitution's provision for comment unless it clearly violates the United States Constitution. Since we do not believe that it does so, we are precluded from giving effect to any contrary implications in *Tyler* or *Adamson.*

 Defendant contends that the reason a defendant refuses to testify is that his prior convictions will be introduced in evidence to impeach him (Code Civ. Proc., § 2051) and not that he is unable to deny the accusations. It is true that the defendant might fear that his prior convictions will prejudice the jury, and therefore another possible inference can be drawn from his refusal to take the stand. The inference that the jury is authorized to draw from the failure to take the stand, however, need not be the only plausible one to be rational under the due process clause. (*People* v. *Adamson,* 27 Cal.2d 478, 493 [165 P.2d 3].) Moreover, without the comment rule, the defendant still faces the dilemma of choos-

ing to testify and having his prior convictions introduced or of remaining silent and not giving this evidence to the jury. The defendant must weigh the danger of impeachment by the introduction of prior convictions for every witness he calls for the defense. ''The fact that the witness may also be the defendant makes the choice more difficult but a denial of due process does not emerge from the circumstances.'' (*Adamson* v. *California*, 332 U.S. 46, 57-58 [67 S.Ct. 1672, 91 L.Ed 1903, 171 A.L.R. 1223].)

The privilege against self-incrimination protects the defendant from assisting the prosecution in building its case against him. It cannot protect him from the inferences that may reasonably be drawn from his failure to rebut the prosecution's case to the best of his apparent ability. For the court and counsel studiously to ignore those inferences or for the court to instruct that no inference is. to be drawn from the defendant's failure to testify can only result in confusing the jury. The existence of the privilege is a matter of common knowledge, and whatever use the defendant makes of it at his trial is also a fact known to the jury. The objective of the court's instructions and counsel's arguments is to assist the jury in reaching the correct decision on the basis of all of the evidence before it. The Fifth Amendment imposes no pointless taboo on the pursuit of that objective.

Defendant contends finally that the trial court erred at the trial on the issue of penalty in admitting into evidence inflammatory details of other crimes committed by him. It does not appear, however, that the trial court abused its discretion in determining that the probative value of the challenged evidence outweighed any probable prejudicial effect. (See *People* v. *Terry,* 61 Cal.2d 137, 142-145 [37 Cal. Rptr. 605, 390 P.2d 381].)

The judgment is reversed.

Tobriner, J., Peek, J., and Dooling, J.,* concurred.

PETERS, J., Concurring and Dissenting.—I concur in the judgment of reversal, and in those portions of the majority opinion which are unrelated to the issue raised by the California comment rule. In that connection the majority hold that

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

section 13 of article I of the state Constitution as amended in 1934[1] is not rendered unconstitutional by the decision of *Malloy* v. *Hogan,* 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653]. I cannot agree with this conclusion, and dissent therefrom. In my opinion the prosecutor's arguments and the trial court's charge to the jury, all relating to the inferences to be indulged because defendant did not take the stand, violated his constitutional rights as now guaranteed him by the federal and state Constitutions.

In my opinion the majority in reaching their conclusion not only misinterpret the United States Supreme Court cases, and their impact on the California comment rule, but fail to consider the real impact of several California cases on the subject under discussion.

The majority concede that *Malloy* established the rule that the Fourteenth Amendment makes the Fifth Amendment privilege against self-incrimination binding on the states, and quote the *Malloy* language to the effect that "The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence" (378 U.S. 1, 8).

In the face of this concession, however, the majority then hold that because of the narrow scope of the permission to comment in California—i.e., because the penalty for not testifying is not very great—such "comment does not conflict with the policies of the federal privilege against self-incrimination."

I am unable to read into *Malloy* any inference that a slight penalty is "no penalty" at all. I am unable to subscribe to the theory that because the inferences to be drawn and commented upon are circumscribed, they do not affect "the unfettered exercise" of defendant's will to remain silent. As a matter of fact, there is explicit language to the contrary in *Johnson* v. *United States,* 318 U.S. 189 [63 S.Ct. 549, 87 L.Ed 704] (cited in the majority opinion). There the high court said (at pp. 196-197) that "where the claim of privilege

[1]The section contains a guarantee that the accused in a criminal case shall not be compelled to be a witness against himself. This is couched in the exact language of the Fifth Amendment to the United States Constitution, and obviously has the same meaning and effect. The 1934 amendment added that "in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury."

is asserted and unqualifiedly granted, the requirements of fair trial may preclude any comment. That certainly is true where the claim of privilege could not properly be denied. The rule which obtains when the accused fails to take the stand (*Wilson* v. *United States,* 149 U.S. 60 [13 S.Ct. 765, 37 L.Ed. 650]) is then applicable. . . . 'The claim of privilege and its allowance is properly no part of the evidence submitted to the jury, *and no inferences whatever can be legitimately drawn by them from the legal assertion by the witness of his constitutional right.* The allowance of the privilege would be a mockery of justice, if either party is to be affected injuriously by it.' '' (Italics added.)

The majority attempt to distinguish *Johnson* on the ground that there the defendant had been misled as to the consequences of his reliance on the privilege. That, of course, does not explain the explicit holding above quoted. We as a state court, on federal constitutional questions, are bound by the unqualified language of the United States Supreme Court to the effect that where, as here, the privilege against testifying could not have been denied, fair trial precludes ''any comment'' thereon or the invitation to draw ''any'' inference therefrom.

The majority conclude with the assertion that the comment allowed by the California rule does not place before the jury anything not already within its general store of knowledge— that is that the jurors as knowledgeable persons are aware that one capable of testifying in rebuttal of incriminating evidence will ordinarily do so. Therefore, it is asserted, neither harm nor injury can occur by reminding them of that fact.[2] That is to assert that the 1934 amendment accomplished nothing at all. But it accomplished a great deal, because, as will be later pointed out, it was necessary to pass it to change the then existing California law which prohibited any comment at all.

The majority opinion argues at some length that *Malloy* did not, by implication or otherwise, overrule *Adamson* v. *California,* 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223], which affirmed this court's holding in *People* v. *Adamson,* 27 Cal.2d 478 [165 P.2d 3], on the theory that

---

[2]This reasoning might support a holding that the *error* was not prejudicial, or a charge or comment to the effect that the jury may draw the usual inferences from the failure of the *defense,* as distinct from the defendant personally, to offer evidence in rebuttal of incriminating testimony. Such *instruction or comment would serve all the purposes* advocated in the majority opinion without raising the constitutional issue.

under then existing law the Fifth Amendment, not then being binding on the states, did not prohibit the comment permitted by the 1934 amendment.

The majority opinion concedes that *Malloy* overruled *Adamson* insofar as it held that the Fifth Amendment was not binding on the states. It is now the law, since *Malloy,* that the states are bound, via the Fourteenth Amendment, by the provisions of the Fifth Amendment. When *Adamson* was decided by the Supreme Court this was not the law. Thus *Adamson* could not, and did not, discuss the question with which we are concerned. *Adamson* did not hold the California comment rule was consistent with the provisions of the Fifth Amendment, but held simply that the validity of the rule was not to be tested by the provisions of that amendment. Thus, it is obvious that the portions of *Adamson* not overruled by *Malloy* are not and cannot be determinative of the issue before us now. What is now left of *Adamson* is merely the holding that this court did not err in holding that the California comment rule did not violate the California Constitution. But that is not the problem here involved. The question now before us, not decided in *Adamson,* is whether our state constitutional provision may stand in view of the federal mandate. To determine that question we need only refer to the unchallenged rule in California prior to the adoption of the 1934 amendment.

As already pointed out, long before 1934 the California Constitution provided, and now provides, in the identical language of the Fifth Amendment, that no defendant in a criminal case shall be compelled to be a witness against himself (see fn. 1). Before the 1934 amendment to that section, in a long line of cases, this court interpreted the state-conferred constitutional immunity (which is identical to the Fifth Amendment) to prohibit any comment whatever on the defendant's failure to take the stand. This long line of cases is in fact being overruled by the majority opinion.

The first case to interpret the original constitutional provision similar to the Fifth Amendment was *People* v. *Tyler,* 36 Cal. 522, 530. Prior to *Tyler,* a defendant in a criminal action was incompetent as a witness. California then adopted a statute (now Pen. Code, § 1323.5) making a defendant competent at his own request. In *Tyler,* the prosecution successfully claimed in the trial court that failure to take the stand and deny testimony presumably within his knowledge gave rise to inferences adverse to the defendant. This court

reversed and held that the policy of the recently adopted statute making defendant, at his request, competent was simply to allow the defendant to rebut evidence against him if he so desired, but not to compel him to take the stand, or to suffer adverse inferences. It was further held that any such policy would be violative of the privilege against self-incrimination contained in the California Constitution if his failure to testify were used to support ''an inference unfavorable to him'' (36 Cal. at p. 528).

Thereafter, *Tyler* was followed without exception until, 65 years later, in 1934, the California Constitution was amended to authorize comment on defendant's failure to testify. These cases establish without question that under the old law (now binding on California via the Fifth Amendment) defendant's failure to testify could not be used in any manner to prejudice him.[3]

*People* v. *Albertson, supra,* 23 Cal.2d 550, referred to in the footnote, is of particular interest because there Chief Justice Traynor (then Justice Traynor) in his concurring opinion said (at p. 584): ''Before the constitutional amendment it was error to comment on the defendant's failure to take the stand or to advise the jury that it could draw inferences unfavorable to him on that account. (*People* v. *Tyler,* 36 Cal. 522.) The constitutional amendment changes the rule of the Tyler case and permits such comment but does not do more.'' He then went on to hold that the comment of the prosecutor in *Albertson* went beyond that allowable under the constitutional amendment.

Under these cases, it is perfectly clear that prior to the 1934 amendment the then existing constitutional privilege against self-incrimination prohibited any comment about de-

[3] A partial list of these cases follows: *People* v. *McGungill,* 41 Cal. 429, 431; *People* v. *Brown,* 53 Cal. 66, 67; *People* v. *Sanders,* 114 Cal. 216 [46 P. 153] (citing *McGungill,* rather than *Tyler*); *People* v. *Kromphold,* 172 Cal. 512, 523 [157 P. 599] (affirming the rule, but holding the error to have been cured, and hence not prejudicial); *People* v. *Mayen,* 188 Cal. 237, 259 [205 P. 435, 24 A.L.R. 1383] (also affirming judgment because of lack of prejudice); *Fross* v. *Wotton,* 3 Cal.2d 384, 393 [44 P.2d 350] (civil case applying the *Tyler* rule to a comparable situation, and including a history of the privilege indicating the necessity of disallowing comment); *People* v. *Albertson,* 23 Cal.2d 550, 584 [145 P.2d 7] (concurring opinion by Traynor, J., adding the comment as an additional ground for reversal); *People* v. *Morris,* 3 Cal.App. 1, 6 [84 P. 463] (holding comment to be prejudicial per se, even when instruction to disregard it was given after objection); *People* v. *Keko,* 27 Cal.App. 351, 353 [149 P. 1003] (citing *Morris* only); *People* v. *Wademan,* 38 Cal.App. 116, 133 [175 P. 791] (acknowledging rule, but distinguishing the case on the facts); and *People* v. *Brown,* 81 Cal.App. 226, 242 [253 P. 735].

fendant's failure to take the stand. No inference of any kind unfavorable to him could be predicated on such failure. Now, since *Malloy,* the state is bound by the provisions of the Fifth Amendment which is framed in language identical to that used in the California Constitution prior to its amendment. *A fortiori,* therefore, the present rule in California is now the same as the rule that existed in California before 1934. It is that rule that the majority opinion so cavalierly disregards and necessarily overrules.[4]

Some reference should be made to this court's decision in *People* v. *Adamson, supra,* 27 Cal.2d 478, written by Justice Traynor, which upheld the constitutionality of the 1934 amendment under the California Constitution. In that case this court did not then hold, as it attempts to do today, that there was no conflict between the privilege against self-incrimination and the right to comment on the exercise of that privilege. Quite to the contrary it carefully and correctly held that such a conflict existed but that the state, by the 1934 amendment, had qualified that right. At page 487 this court then stated: ''The practical effect of the 1934 amendment may be that many defendants who otherwise would not take the stand will feel compelled to do so to avoid the adverse effects of the comments and consideration authorized by the amendment. . . . Such a coercive effect, however, is sanctioned by the amendment, which, being later in time, controls provisions adopted earlier.'' It will be noted that there this court characterized the comment rule as constituting a ''compelling'' waiver of the privilege and as having a ''coercive effect'' upon a defendant who desired to avail himself of the privilege. Today the court characterizes the comment rule as imposing but an inconsequential penalty.

From the foregoing it follows that, unless the majority are willing to overrule *People* v. *Tyler, supra,* 36 Cal. 522, and the many cases following it, and *People* v. *Adamson, supra,* 27 Cal.2d 478, there is no alternative but to hold that the California comment rule creates a compulsion upon a defendant ''who otherwise would not take the stand'' and has a ''coercive effect.'' The contrary rule adopted by the majority does not permit a defendant ''to remain silent unless he

---

[4]It should also be mentioned that New Jersey (a state which had a comment rule comparable to that permitted by the 1934 amendment to our Constitution) has held that in light of *Malloy* the old New Jersey rule violates the privileges granted by the Fifth Amendment (*State* v. *Murphy* (1964) 85 N.J. Super. 391 [204 A.2d 888]).

chooses to speak in the unfettered exercise of his own will.'' *Malloy* informs us that such a defendant is ''to suffer no penalty . . . for such silence.'' The majority rule authorizes the court and prosecutor to invite the jury to indulge in those inferences which *Johnson* holds would constitute a ''mockery of justice.'' Thus, in my opinion, the comment rule is unconstitutional. That being so it was error to permit such comment.

Were it not for the other errors pointed out in the majority opinion which require a reversal, the error under discussion, however, might not necessarily require a reversal. In my opinion the beneficent provisions of section 4½ of article VI of our state Constitution are applicable to such error.

It is urged that that section is not applicable to errors involving due process under the Fourteenth Amendment. In this connection reliance is had upon some very strong language to that effect in such cases as *People* v. *Kiihoa,* 53 Cal. 2d 748, 752 [3 Cal.Rptr. 1, 349 P.2d 673] ; *People* v. *Modesto,* 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33] ; *People* v. *Muza,* 178 Cal.App.2d 901 [3 Cal.Rptr. 395] ; and in Witkin, California Criminal Procedure (1963) 733-734. Comfort is also found in the language of such federal decisions as *Rogers* v. *Richmond,* 365 U.S. 534 [81 S.Ct. 735, 5 L.Ed.2d 760] ; *Jackson* v. *Denno,* 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908], and similar cases dealing with the admission of involuntary confessions. The language of these and other authorities, when separated from the problem there under discussion, appears to support the proposition that whenever the error is predicated upon constitutional grounds and results in the denial of a fair trial (due process under the Fourteenth Amendment) it is reversible per se, and the resulting judgment is not saved by the fact that the error was not prejudicial. However, when such authorities are viewed together with those which have failed to reverse in the presence of acknowledged constitutional error, it becomes apparent that those requiring reversal per se comprise a specific class, dealing with the admission of coerced confessions or evidence obtained by brutality or other conduct shocking to the sensibilities. Other authorities (both federal and state) indicate that in many other situations the courts have held error which constituted a denial of due process to have been nonprejudicial and hence nonreversible.

Looking first to the federal rule, the authorities relied upon dealt either with the use of a coerced confession or evidence

obtained by similar coercion, force or brutality. They are the cases that adopted the so-called ''exclusionary rule.'' That rule requires the absolute exclusion of evidence obtained in the manner indicated, as well as all evidence which is the product thereof (''fruit of the poisoned tree''), and likewise requires reversal if such confession or evidence has not been excluded. On the other hand, *Malloy* (which is the cause of our present reexamination of the rule) gives no hint that the highest federal court considers every violation of due process to be prejudicial per se. Many prior decisions of the United States Supreme Court indicate that it will not reverse for every acknowledged constitutional error, some of which dealt with error of the type alleged herein. In *Snyder* v. *Massachusetts,* 291 U.S. 97 [54 S.Ct. 330, 78 L.Ed. 674, 90 A.L.R. 575], it was held that the absence of defendant during the proceedings against him would constitute a denial of due process. However, the court refused to reverse because the defendant was absent from such a minor portion of the proceeding that no prejudice resulted. Justice Cardozo, speaking for the court, said (at pp. 106-108) : ''Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow. . . . So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'' It appears that in *Snyder* the high court applied to acknowledged constitutional error the same test required by our state constitutional provision prohibiting reversal in the absence of a miscarriage of justice.

In *Johnson* v. *United States, supra,* 318 U.S. 189, the court held that comment on the defendant's reliance on his privilege against self-incrimination was error, but failed to reverse because the error had been waived. That was not tantamount to affirmance because the error was nonprejudicial, but indicates that denial of due process is not always reversible per se.

In *Wilson* v. *United States,* 149 U.S. 60 [13 S.Ct. 765, 37 L.Ed. 650], the court reversed because of the prosecutor's comment on defendant's failure to take the stand as a witness. There the court held the comment to be error because of a federal statute requiring that no presumption shall be created against defendant by reason of his decision not to testify, and

therefore was not required to rely on the constitutional provisions. However, the following language (at p. 70) is persuasive herein: " 'We do not see how this statute can be completely enforced, unless it be adopted as a rule of practice that such improper and forbidden reference by counsel for the prosecution shall be regarded good ground for a new trial *in all cases where the proofs of guilt are not so clear and conclusive that the court can say affirmatively the accused could not have been harmed from that cause.*' " (Italics added.) While the closing clauses of the foregoing quotation may be less liberal than our *Watson* rule (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]), it conclusively demonstrates that, in the field of illegal comment, the United States Supreme Court has in the past been mindful of the fact that error may be nonreversible when the circumstances show it to be nonprejudicial. For similar reasoning by the lower federal courts, see *Coleman* v. *Denno* (D.C.S.D.N.Y. 1963) 223 F.Supp. 938, affirmed in *United States* v. *Denno* (2d Cir. 1964) 330 F.2d 441; *United States* v. *Di Carlo* (2d Cir. 1933) 64 F.2d 15.

Turning now to the California authorities, even more cause exists to adhere to the dictates of section 4½ of article VI of our state Constitution. Prior to the 1934 amendment authorizing comment on a defendant's failure to testify as a witness, as already pointed out, such comment was violative of the defendant's constitutional privilege against self-incrimination. But, during that period, it was the uniform rule that such comment, although erroneous, did not require reversal if, under the circumstances of the case, it was not prejudicial (*People* v. *Mayen, supra,* 188 Cal. 237, 259.)[5] A similar, although not identical issue was presented in *People* v. *O'Bryan,* 165 Cal. 55 [130 P. 1042], wherein the court held that defendant's previous testimony before the grand jury had not been voluntary, and for that reason it was error to allow evidence of that previous testimony to be produced at trial. However, conviction was affirmed on the ground that the error was not prejudicial.

Subsequent to the 1934 amendment authorizing comment on the defendant's failure to testify there was no cause for the courts to pass upon the prejudicial or nonprejudicial

---

[5]Certain language contained in the *Mayen* opinion, going to an entirely different point, has recently been disapproved in *People* v. *Matteson,* 61 Cal.2d 466, 470 [39 Cal.Rptr. 1, 393 P.2d 161]. Such disapproval does not affect the matters here involved.

nature of a procedure which was no longer erroneous. However, the introduction of, or comment upon, defendant's previous testimony before the grand jury was presented on several occasions. In *People* v. *Kynette*, 15 Cal.2d 731, 749-751 [104 P.2d 794], it had been held that a defendant who had voluntarily testified before the grand jury as to some matters, but who had refused to answer other questions on the ground of self-incrimination, and who voluntarily testified at his trial, might be impeached by cross-examination as to the inconsistency between his exculpatory testimony at trial and his alleged basis for claiming privilege before the grand jury.[6] The opinion pointed out the limited purpose for which such evidence might be introduced. Shortly thereafter, a similar problem was presented in *People* v. *Montgomery*, 47 Cal. App.2d 1 [117 P.2d 437]. There the court was bound by *Kynette* to hold the introduction of the matters which transpired before the grand jury to have been admissible for the limited purpose of impeachment. However, the court found error in the fact that the prosecutor was allowed to comment on the evidence for the purpose of drawing the inferences beyond that specific limitation. That error, however, was held to have been nonprejudicial, the court stating (at p. 21) that "it does not follow that every invasion of even a constitutional right necessarily requires a reversal, . . ." (Citing *People* v. *O'Bryan, supra,* 165 Cal. 55, 60.)

Erroneous denials of constitutional guarantees other than those arising out of the Fifth Amendment (but many which were held to have constituted a denial of due process) have consistently been held not to require reversal when not prejudicial. A few examples are set forth:

(a) Error arising out of the absence of defendant from a portion of the proceedings—*People* v. *Isby*, 30 Cal.2d 879, 894 [186 P.2d 405]; *People* v. *Daniels*, 85 Cal.App.2d 182, 195 [192 P.2d 788]; *People* v. *Miller*, 33 Cal. 99; *People* v. *Erwin*, 4 Cal.App. 394, 396 [88 P. 371]. (The last two were decided prior to the adoption of section 4½ of article VI.)

(b) Failure to instruct defendant as to certain of his rights —*People* v. *O'Brien*, 88 Cal. 483, 489-490 [26 P. 362].

(c) Illegal search and seizure—*People* v. *Parham*, 60 Cal. 2d 378 [33 Cal.Rptr. 497, 384 P.2d 1001], wherein it is said (at p. 386): "To require automatic reversal for such harmless error could not help but generate pressure to find that

---

[6]This holding of *Kynette* may now be open to question in view of *Malloy.*

the unreasonable police conduct was lawful after all and thereby to undermine constitutional standards of police conduct to avoid needless retrial. . . . An exclusionary rule so rigidly administered could thereby defeat itself.''

If the word ''prosecution'' is substituted for the word ''police'' where the latter twice appears in the quotation from *Parham,* the reasoning applies equally to improper comment on defendant's failure to take the stand.

In this opinion there is no necessity to determine whether the claimed error was prejudicial, first because the majority has ruled that it was not error, and second because the judgment must be reversed for reasons other than the violation of the comment rule.

I agree with everything said in the majority opinion, including the reversal, except that portion discussing the comment rule. From that portion of the opinion, I dissent.

SCHAUER, J.,* Concurring and Dissenting.—I concur in those portions of the majority opinion which resolve the issue grounded on the California comment rule (Cal. Const., art I, § 13). Specifically, I agree with the discussion and conclusions of the Chief Justice relative to the applicability and effect of *Malloy* v. *Hogan* (1964) 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653], and upholding the good sense and constitutional vitality of the subject rule.

To suggest that reasonable inferences will not or should not be drawn by the fact finder from the failure of an accused to testify as to matters obviously within his knowledge is absurd. Common sense tells us that in such a situation the inferences will be adverse to the defendant if no comment— i.e., no instruction—is given relative to the right of an accused to stand on his plea of not guilty and the comprehensive burden of the state to prove every element of guilt beyond a reasonable doubt. The California comment rule operates constructively to make real and workable to a conscientious fact finder the right of the accused and the burden of the prosecution.

The use of the comment rule in defendant's trial was not only constitutionally permissible, it was good sense and eminently fair. When there is neither relevant court instruction nor any reference by court or counsel to defendant's silence in the face of obvious and significant evidence of guilt,

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

the impact of the silence on the jury will more likely intensify than diminish the force of the positive evidence. Conscientious and intelligent jurors are curious jurors; they yearn for full instructions covering their duty in resolving every issue before them.

The subject California rule is not so much a comment rule as it is an instruction as to law and a caution as to duty: it emphasizes the burden of the prosecution to prove beyond reasonable doubt every essential element of the crime charged; it makes altogether clear the right of the defendant not to testify at all and not to be prejudiced by his own mere silence; it precludes the jury from drawing any inference adverse to the defendant because of his decision not to testify *unless it is further shown* that defendant has knowledge of, and the ability to produce, facts which could deny or explain, or in some way obviate the effect of, evidence which if believed, would establish guilt. The rule is essentially correlative both to defendant's fundamental right of silence and to the state's burden of proof; it becomes operative only when competent evidence has been adduced which is sufficient to establish (1) a prima facie case against the accused, and (2) his ability to furnish exculpatory evidence. Then the necessity for, and the fairness of, the rule become obvious. The comment itself must be hypothetically definitive and explanatory of the rule and its application. Certainly as held by the majority such ''carefully circumscribed comment does not conflict with the policies of the federal privilege against self-incrimination.'' Failure to comment at all on the obvious facts, or on the other extreme, categorically directing the jurors not to draw inferences which the undisputed evidence and a sound mind dictate, would be futile and would tend to make a mockery of the fact finding process.

We are bound to recognize that the essential function of jurors is to draw (or resolve conflicting) inferences from all material circumstances. The failure of a defendant to testify relative to tentatively established incriminating facts which are peculiarly within his knowledge is in itself a fact which, as hereinabove suggested, may become the more portentous if comment thereon, as required and limited by the California rule, is precluded. As the Chief Justice says, ''The defendant . . . is normally faced with the choice of testifying to avoid adverse inferences or of remaining silent and suffering their consequences.'' The purpose of a fair trial is to discover the truth and upon the truth to render the judgment provided

by law. A fair trial cannot be had in an intellectual vacuum; and a fair trial—of course, but it bears emphasis—must be equally concerned with fairness to the whole body politic as well as to the defendant.

I do not concur in the conclusional declaration that "With respect to defendant's last and most complete and damaging statements, all of the conditions of the *Escobedo* holding were met. . . . Accordingly, the judgment must be reversed." I am not persuaded that the hypothesis is tenable or that this result must follow. What may be "most . . . damaging statements" is typically for jury and trial judge appraisal. And as I read the *Escobedo* opinion I am impressed with the conclusion that Mr. Justice Goldberg diligently sought to confine its application to the case he defined and decided. I would limit its reach by the aggregate—not by a selected item or items—of the congeries of facts which he so painstakingly assembled and by multiple reiterations emphasizes. As demonstrated to my satisfaction by Justice Burke in his dissenting opinion in *People* v. *Dorado* (1965) *ante,* pp. 338, 364 [41 Cal. Rptr. 169, 398 P.2d 361], the recited facts of that case clearly show that the majority ruling therein was not compelled by *Escobedo.* To the contrary, as hereinafter documented, *Dorado* appears to me to extend the scope of *Escobedo* in an area forbidden to us by the California Constitution.

I agree with Chief Justice Traynor that *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], is not controlling here, but I note also a related statement which on its face might appear to be a speculative or advisory ruling relative to a question of law and fact which may or may not arise on the third trial of the case at bench. The proposition is stated by the majority as follows: "The statements made between the time Connie's body was found and the time defendant sought to consult again with his attorney present still a different problem. Under our holding in *People* v. *Dorado, ante,* p. 338 [42 Cal.Rptr. 169, 398 P.2d 361], these statements are inadmissible unless as to them defendant waived his right to counsel and his right to remain silent. In view of his reference to his attorney's advice with respect to making these statements, it is possible that defendant waived his rights as to them. That reference was ambiguous at best, however, and unless the prosecution can present additional evidence of waiver on retrial, these statements should be excluded." The metage of inferences which may be drawn from the myriad cumulant circumstances of a trial is both primarily and distinctively a trial

judge's function. It is only upon the complete absence of tenable inferences supportive of the trial court's ruling that we should disturb a judgment in this respect. I do not find myself sufficiently qualified by the record of the second trial now before us to rule for the next trial that "unless the prosecution can present additional evidence of waiver . . . the statements should be excluded." In the case at bench I find no error in their admission.

I agree with Chief Justice Traynor that on any tenable view of the law "The statements made by defendant before Connie's body was discovered are admissible" and that "there is no basis for their exclusion." These statements alone (i.e., excluding from consideration all other statements by defendant), when considered with the other probative evidence which was properly received, in my view amply support the judgment of the trial court. I also agree that "In the present case the officers' investigatory and rescue operations were necessarily inextricably interwoven until Connie's body was found, and it would be needlessly restrictive to exclude any evidence lawfully obtained during the rescue operations. Under these circumstances we do not believe that the *Massiah* case is controlling."

Although, as above shown, I am in full accord with much of the discussion by the Chief Justice, and with a number of his important conclusions, I cannot agree that the judgment must or should be again reversed. It becomes necessary to again refer to what I understand to be the duty unequivocally imposed upon this court by the Constitution of California which grants—and *specifically limits*—our jurisdiction in the review of "criminal cases where judgment of death has been rendered." I have reference to sections $4^1$ and $4\frac{1}{2}$,[2] article VI. I know of no power possessed by this court other than such as is granted to it by the people of the state in the Constitution of California. (Manifestly the grant of state power does not come from the United States Constitution or

---

[1]California Constitution, article VI, section 4: "The Supreme Court shall have appellate jurisdiction . . . on questions *of law alone,* in all criminal cases where judgment of death has been rendered; . . ." (Italics added.)

[2]California Constitution, article VI, section $4\frac{1}{2}$: "No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

the judgment of a federal court.) That same grantor, in the same document, also expressly delimits our power in the specific area which is relevant. That limitation, it appears to me, is transgressed by the recent majority decision in *People* v. *Dorado* (1965) *supra, ante,* p. 338, as is indicated by the dissents of both Mr. Justice McComb and Mr. Justice Burke.

I have no quarrel with the forthright narration of facts in the majority opinion of the case at bench. Among other things the majority candidly state "It is not disputed that defendant killed the two girls." I add that on any reasonable view of the evidence it is not disputable that the evidence sustains the jury's implied findings at both the first trial and at the second trial that the object of the two murders was to accomplish the rape of Connie. I cannot find anything in this record which justifies the conclusion of fact or of law that either the conviction of defendant or the sentence of death pronounced thereon constitutes a miscarriage of justice.

Indubitably it is our duty to be concerned with the philosophy as well as the letter of criminal law. Of course our system is not a perfect one. It is not yet given to human beings to create a society perfectly motivated or governed. Men of goodwill may differ sharply in selecting the means to an end, if not as to the objective itself. The ever increasing number in recent years of reversals on technical grounds of judgments in major criminal cases suggests the need for reexamination of the incidents of our philosophy and of our procedures. Are we to abandon or continue to recognize the theory that as between mankind and the lower animals there is a major difference in social responsibility? Are we to continue or abandon the theory that human beings are free moral agents? That those who fail to be restrained by moral concepts may nevertheless be deterred away from, or influenced toward, a given course of conduct by punishment on the one hand or reward on the other? In our organized society today, should the courts, as perhaps the chief instrumentality for attaining its elementary objectives, be primarily concerned with protecting the crime perpetrating nonconformist, not merely in the heretofore recognized constitutional rights of law abiding members, but, as against execution of penal sanctions for demonstrated guilt, in revising procedural rules and applying the revisions retroactively for the benefit of the accused? Or should we give our first concern to protecting law abiding members of that society by firm and prompt enforcement of tenable rules of law as against the rapist-

murderers and similar types of criminal nonconformists? Certainly even the most evil one shall have his due process and fair trial. This defendant has enjoyed these benefits twice over. The sledge hammer slayings of Connie Mack and Mary Mack cannot be undone. But sure, prompt and unrelenting exaction of the penalty of the law could serve to save other innocents from similar deaths. If this philosophy is wrong then it would seem that our entire penal-sanction-for-crime system of law should be abandoned. But until a better system has been provided let us not destroy or further deplete the efficacy of the one we have.

For the reasons sufficiently articulated in my dissent in *People* v. *Modesto* (1963) 59 Cal.2d 722, 735 [31 Cal.Rptr. 225, 382 P.2d 33], I could not then concur in reversing the judgment on the prior appeal. The reversing justices made no finding that it was more probable than not that a verdict more favorable to the defendant would have resulted in the absence of the then declared error. The reversal therefore, as I understand the language of, and respect due, our Constitution, was, and today's is, in excess of this court's appellate jurisdiction as exclusively granted and specifically limited by sections 4 and 4½, article VI, California Constitution (see fns. 1 and 2, *ante*, p. 467).

I think it is fair also to add that the reversals of the judgments, both on this appeal and the preceding one, appear to be due not to any incompetence or neglect or mistakes of the investigating or prosecuting officers, or of the trial judges. The reversals have come because courts of appellate jurisdiction have seen fit, or felt compelled, to change the rules governing relevant procedures and to make the changes retroactively effective. If the compulsion for retroactive application is not absolute it should not be indulged. The people of California, as well as this defendant, have a right to due process and fair law enforcement. Among the people who are punished most severely by the new trials are, of course, the family members of the murdered little girls.

It appears to me that the proceedings on, and the results of, the second trial, as illumined also by the record of the first trial, demonstrate that there has been no miscarriage of justice in the trial court.

For all the reasons hereinabove stated I would affirm the judgment.

McComb, J., concurred.